COLONIAL FABRICS, Inc. v. COMMIS-
SIONER OF INTERNAL REVENUE.

No. 30, Docket 22352.

United States Court of Appeals
Second Circuit.

Argued Jan. 14, 1953.

Decided Feb. 16, 1953.

Mark M. Horblit, Boston, Mass. (Jacques M. Levy, New York City, on the brief), for petitioner.

Carlton Fox, Sp. Asst. to Atty. Gen. (Ellis N. Slack, Acting Asst. Atty. Gen., and Helen Goodner, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

The sole issue presented to us on this petition contesting a deficiency assessment of excess profits taxes arises by reason of a difference in valuation of property received by taxpayer in payment for 200 shares of its non-par value stock and constituting "equity invested capital" for tax assessment purposes. I.R.C. § 718, 26 U.S.C. The value set by the taxpayer and supported throughout by it was $100,000; this figure was reduced by respondent to $30,000 and the Tax Court has sustained this reduction. Because of this and certain other adjustments, the decision below found deficiencies in 1943 of $2,857.43 in the taxpayer's declared value excess profits tax and $63,096.50 in its excess profits tax. Other adjustments made were ultimately not contested below and are not here. The taxpayer's motion for review by the full Tax Court was denied and this petition for review followed.

The taxpayer was incorporated under the laws of the State of New York on April 9, 1943; the tax period here involved is from that date until the end of the year. Since its stock was not dealt in on any market, and since issued stock had been paid for in property as well as cash, it seems agreed that the value of the property received for the stock determines the issue. This property—drapery materials—had been owned by the Mount Hope Finishing Co. in its Dighton-Colonial Department, for which another corporation, Colonial Drapery & Curtain Corp., acted as selling agent. Mount Hope had been engaged in the same business for which the taxpayer was organized, namely, buying and converting drapery material and upholstery fabrics and selling these to retailers, jobbers, and manufacturers of drapery and furniture. Mount Hope had determined to close its Dighton-Colonial Department and hence to dispense with the services of the Curtain Corporation. On April 1, 1943, an inventory was prepared by the staff of the Curtain Corporation under the direction of Frank J. Mann, its secretary-treasurer and general manager. This showed three classes of merchandise, viz., eight items of "grey goods" (fabrics in an unfinished condition) at a total cost of $13,946.43; eleven items of "goods in process" at a total of $53,182.07; and fifty-seven items of "finished goods" at $33,645—or an over-all total of $100,773.50. The record shows that this was in large part a broken lot inventory purposely reduced by

Mount Hope, with some discontinued styles (it being a practice in the trade to introduce styles every week). On May 7, 1943, Mount Hope sold the goods to Abbott Merchandising and Finance Co. for $30,000 cash.

Meanwhile Mann became incorporator, stockholder, director, and vice-president of the new company—the taxpayer here—which employed his Curtain Corporation as its selling agent. At the time of the hearing below he was the taxpayer's secretary; asserting familiarity with values of this type of merchandise, he testified that the fair market value of the odd lots in question was "at least $100,000, probably a little more," and further that the property had particular value to the taxpayer. His testimony was entirely consistent with a long letter he wrote Abbott on May 28, 1943, making an offer for the goods, which is in many ways a complete résumé of the taxpayer's case. It is quoted extensively in Judge Opper's full opinion below. It contains, among other details, the self-serving opinion that "this close-out inventory" would have "quite substantially greater" value to petitioner than to other converters or dealers—since no one else is in as good a position "to handle and merchandise this inventory to the best advantage"—which has been quoted by commentators in criticism of the decision below. Vernon, Jr., and Molloy, Blockage and the Invested Capital Credit, 8 Tax L.Rev. 131, 146, 147. But it also contains, repeated in details too extensive to set forth here, his not unreasonable grounds for this belief. In short, these were that, since he "was largely instrumental in the selection, styling and merchandising of the inventory" in the first place as treasurer of the Curtain Corporation and since he had been "making efforts to have a corporation organized to take the place which Mount Hope recently held in relation to" Curtain, "the new corporation could handle the inventory with peculiar advantage by reason of its opportunities to match and fill in shades, patterns and styles for retailers and jobbers with whom the Dighton-Colonial Department dealt and whom we know well" and it would "benefit by reason of the good-will which it would

thus be able to establish with those customers." After continuing in this vein in justification of the offer he was making for the purchase of the goods he counsels haste in its acceptance in order that the Dighton-Colonial customers might be promptly approached "if the great though intangible value of the good-will, established with those customers at immense expense and cost over a period of nearly half a century, is to be preserved. Delay will afford competitors opportunities which may, as you can readily imagine, result in loss of this valuable good-will with those customers."

The offer which he actually made is also of interest. Stating that "the new corporation is not in a position to purchase the inventory from you for cash," he goes on to urge the advantage to Abbott of a sale paid for in taxpayer's stock, which will yield much more when the new corporation prospers, etc. So, after explaining taxpayer's corporate setup, and the payments in cash and property for stock already issued, he eventually offers for the merchandise a total of 150 shares at $500 per share, or a face value of $75,000. While the taxpayer now asserts that the letter was "merely 'trade talk'" and written on behalf of the Curtain Corporation, it is of course an actual offer by an active officer of the taxpayer—an offer which, when substantially increased, led to a purchase approved by the directors on the very same lines set forth in this trade talk.

For this letter did not entirely soften Abbott's heart; the deal, when finally completed on June 28, called for a payment of 200 shares at a face value of $100,000. In a resolution of taxpayer's directors adopted on June 14, 1943, approving this purchase for 200 shares of the common stock and finding "that said merchandise is worth one hundred thousand ($100,000.00) dollars," there is also set forth the connection of its vice-president (Mann) with the merchandise and with the customers therefor. The final Whereas clause before the conclusion as to value is as follows:

"Whereas the board of directors is of opinion that by supplementing and filling in the assortments and lots of

said merchandise, this corporation will be able to dispose thereof, over a period of time, at a profit and will, in addition, benefit from the good-will resulting from being enabled, through the purchase of said inventory, to furnish supplies of the kinds of goods comprised therein to the retailers, jobbers and manufacturers who have been and are now carrying goods of that kind in their inventory."

Judge Opper set forth meticulously in his findings all the facts bearing upon the issue in much more detail and completeness than we have attempted. His final finding was: "The fair market value of the property transferred by Abbott to petitioner in exchange for 200 shares of stock was $30,000 on the date of exchange." He then wrote a brief opinion explaining his decision of the "single issue" thus "disposed of by our ultimate finding of fact." Here is where he comes to grief so far as petitioner is concerned. For petitioner separates and disparately dissects the judge's explanations and finds them legally erroneous and insufficient. Perhaps we, too, will suffer the same fate by proffering explanation. For finding market value is, after all, something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation.

But, be that as it may, our function, as we conceive it, is not to attempt justification for each and every rationale suggested by the judge, but to decide whether on all the evidence he could legally reach the result he did, or otherwise whether the result he reached was "clearly erroneous." F.R. 52(a); I.R.C. § 1141(a), 26 U.S.C. So when the judge states that he resolved the issue "in accordance with respondent's determination not only because of its presumption of correctness, but also because the record fails to supply convincing evidence that the sale of the identical property for cash a few weeks prior to the transfer to petitioner is not the best evidence of its value on the date in issue," we do not believe he was applying some erroneous rule of presumption or best evidence. We think he was making only a very human response

to the case, namely, that he was disposed to accept as convincing the one factor of purely objective valuation in the market, as shown by actual transfer, rather than the subjective and hopeful valuations submitted by petitioner. Warner v. C. I. R., 2 Cir., 193 F.2d 328; Maytag v. C. I. R., 10 Cir., 187 F.2d 962; Guggenheim v. Helvering, 2 Cir., 117 F.2d 469, certiorari denied Guggenheim's Estate v. C. I. R., 314 U.S. 621, 62 S.Ct. 66, 86 L.Ed. 499.

Let us look at these various estimates for the taxpayer. First we should consider the value set by Mann and accepted by the directors based upon an increased worth of the goods to the taxpayer beyond its value to other converters or dealers. We can well accept the proposition that property without a ready market value may be shown to have a special value to a particular taxpayer under circumstances sufficiently proven to establish this. Cf. Lamprecht v. Swiss Oil Corp., 6 Cir., 32 F.2d 646, 652. Even so, to hold such an allowance here compelled by law seems an extensive step not justified by precedent. As reiterated so often by Mann and even by the directors in their resolution, what was being relied on was the "good-will" from the past ownership which was expected to pass with Mann to the new corporation if only something could be obtained to which it could adhere on transfer. But Mann himself testified that Mount Hope gave him no opportunity to buy the goods; and it appeared that the Dighton-Colonial special designs— valued at $800—had come to the taxpayer through a different source. Mann also stated that "Colonial" was a trade name under which goods had been sold for twenty-five years, going back to a time when it was used by himself and others in the employ of Marshall Field & Co. It is perfectly apparent that the expected good will was a component of many elements which had not been purchased by the taxpayer and in connection with which the physical material, being readily obtainable in the market, would not seem important except as the sole transfer, albeit not directly, from Mount Hope to taxpayer. We need not analyze the legal effectiveness of such a transfer or the propriety of such

claim of good will in customer solicitation to realize how highly speculative at best any such assumed element of value must be.

As a matter of fact, the course of negotiation bears this out. Mann admitted he could not offer Abbott cash, but pressed upon the seller the rich speculation he optimistically envisaged in the stock of this seven-week-old corporation. But the $75,000 of stock he then offered had to be increased by another $25,000, although there had been no change in values in the market, before the sale was effected. Nothing could be clearer than this history to show that this maximum value was built upon future hope and was not even claimed to Abbott as present worth. We do not think the trier of fact legally bound to recognize such uncertainties.

This analysis will serve to dispose also of the directors' valuation, for it was based upon the same elements of futurity and without doubt was determined by Mann's judgment. Some claim is made that since under N. Y. Stock Corporation Law §§ 12, 69, the judgment of the directors as to the value of property received for stock is to be accepted in the absence of fraud, the directors' valuation governs here. But that state statute was directed to the objective of organizing corporations to start business and defining the obligation of their stockholders; it purports only to hold the stock full paid and the holder not subject to further call. On an issue involving the federal taxing power it may properly be received as evidence of value, see Sioux City Stock Yards Co. v. C. I. R., 8 Cir., 59 F.2d 944; Rookwood Pottery Co. v. C. I. R., 6 Cir., 45 F.2d 43; but it cannot be taken as conclusive and the federal revenue thus subjected to state control. Estate Planning Corp. v. C. I. R., 2 Cir., 101 F.2d 15, dealt with another issue, that of the *validity* of bonds issued by a corporation for property.

Other evidence relied on are the inventory prices set by Mann's staff at the Curtain Corporation on March 31, the purchase price of some items to the taxpayer in the period from April to June, 1943, and market quotations from trade papers and the like as to individual items. The first of these is not explicitly discussed in the opinion below; however, it suffers to some extent from the same defect found by the court in the others. These were rejected because they did not fully represent or correspond to the items in petitioner's bulk purchase and because that purchase was of odd lots and depleted assortments, to which the quotations in evidence are not necessarily applicable. Moreover, the quotations from trade papers were OPA ceiling figures, rather than actual market prices. In effect this evidence illustrates petitioner's case which is to compel the federal revenue authorities to accept an obviously top figure for individual items in the market and reject the actual sale price brought by the goods as a whole in their open sale. Hardly any trier would accept such a maximum. Doubtless many would attempt to strike some compromise somewhere in the middle. But a figure thus arrived at would itself be unreal, one never seen anywhere in the record. We do not believe the court can be held in error for sticking to such reality as there was.

There remain certain questions as to the receipt of evidence. An Internal Revenue Agent testified that Mr. Mark M. Horblit called on him in June, 1948, as representative of the taxpayer to discuss the matter of the inventory and, over objection, was permitted to testify that Mr. Horblit in suggesting the possibility of a compromise had said that the fair market value of the merchandise at the time of sale would be not more than $30,000, that to the best of his knowledge it comprised "odds and ends and pieces of a discontinued line." The objection was that Horblit was not an officer or authorized to represent the company. He had been a stockholder of the taxpayer from the beginning, was an officer in 1943, but apparently not in 1948, and as attorney has represented taxpayer throughout these proceedings. The judge expressed doubt whether the statements were binding on the corporation; although he carefully reports all this in his findings, it is not clear what effect, if any, this evidence had on his conclusions. But we think an attorney coming to discuss a compromise of tax litigation on behalf of his client surely has sufficient au-

thority to discuss the elements of his case with Revenue Agents; the weight of what he says is another matter. Objection is also made to a finding which states that Abbott in its tax return for the year 1943 made no entry showing its sale to taxpayer as a transaction completed with profit. But the evidence was based on Abbott's tax return which was received with the taxpayer's statement of "no objection"; and the isolated finding appears to have no connection with the judge's conclusion.

Decision affirmed.