W E G Dial Telephone, Inc. v. Commissioner.
W E G Dial Tel., Inc. v. Commissioner
Docket No. 621-62.
United States Tax Court
T.C. Memo 1966-41; 1966 Tax Ct. Memo LEXIS 240; 25 T.C.M. (CCH) 233; T.C.M. (RIA) 66041; February 25, 1966
Joe E. Burris and A. Henry Cuneo, 928 Grand, Kansas City, Mo., for the petitioner. Hugh C. McMahon, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: [1] Respondent determined the following deficiencies in the income taxes of petitioner: Taxable year
Deficiency
1957
$3,594.19
1958
553.47
1959
41.94
*242 The issues for decision are: (1) whether deductions claimed by petitioner in 1957 of $5,557.54 for retirement and abandonment of property and $1,945.75 for amortization of "telephone plant acquisition adjustment" are allowable; and (2) whether deductions claimed in 1959 of $22,295.73 for retirement of a portion of its assets and $9,454.51 as a net operating loss deduction are allowable. In his amended petition, the petitioner claimed additional retirement and abandonment losses of $6,772.72 in 1957 and $19,320.75 in 1959. The petitioner has conceded that respondent correctly determined that a claimed deduction of $21,035.68 in 1958 should be disallowed and that the rate of depreciation for such capital expenditure was as determined in respondent's notice of deficiency. Findings *243 of Fact Some of the facts have been stipulated by the parties and are hereby found accordingly. W E G Dial Telephone, Inc (hereinafter referred to either as W E G or petitioner), is a Kansas corporation with its principal place of business in Gardner, Kansas. It is in the business of providing telephone service. As a regulated public utility, it is required to maintain its books and records in accordance with the rules of the Federal Communications Commission, the Kansas Corporation Commission and the Rural Electrification Administration. W E G's Federal corporation income tax returns for the years ended December 31, 1957, through December 31, 1959, were filed with the district director of internal revenue, Wichita, Kansas. W. E. Gault Associates, a firm of consulting engineers located in Gardner, Kansas (hereinafter referred to as Firm), was begun in 1954. W. E. Gault was a partner in the firm, which specialized in the engineering, planning, and supervision of construction of telephone exchanges. Practically all of this work dealt with the conversion of manually operated exchanges to dial systems. The engineering and planning phases of the Firm's work were incorporated into *244 an "area coverage design." This document detailed the existing physical properties of the manual exchange and listed the properties that would be (a) retained without change in the dial system, (b) rebuilt for use therein, or (c) abandoned as unsuitable therefor. It outlined the physical requirements of the new system and contained an estimate of its cost of construction. Pursuant to preparation of the design, an engineering survey of the manual exchange's properties was made by physical examination thereof. From this survey the condition of each property was determined and was expressed in terms of its remaining useful life. On April 9, 1955, W. E. Gault and one Moore, another member of the Firm, made such a survey of a manual exchange in Overbrook, Kansas. The president of W E G requested the survey because of W E G's interest in acquiring the exchange. The Firm's appraisal of Overbrook's properties showed the following: Total
Fair
Cost of
Construction
Replace-
Average
Market
Construction
Overhead
ment Cost
Condition
Value
a. Aerial Wire (retired)
$ 429.38
$ 107.35
$ 536.73
50%
$ 268.36
b. Buried Cable
7,106.07
1,776.52
8,882.59
90
7,994.33
c. Subscriber Stations (retired)
4,253.00
0
4,253.00
80
3,402.40
d. Drop, Protector Station Wirings
(retired)
5,491.08
1,372.77
6,863.85
80
5,491.08
e. Central Office Cable
380.00
95.00
475.00
80
380.00
f. Central Office Equipment (retired)
5,000.00
250.00
5,250.00
50
2,625.00
g. Vehicles
2,800.00
0
2,800.00
40
1,120.00
h. Office & Work Equipment
521.71
0
521.71
80
417.37
Material & Supplies
916.44
0
916.44
0
916.44
Land Acquisition
500.00
0
500.00
0
500.00
$27,397.68
$3,601.64
$30,999.32
$23,114.98
*245 The following is an excerpt from the report: 2. EXISTING SYSTEM 2.1 Outside Plant 2.11 The system of the Overbrook exchange consists only of city plant, as all lines in the rural are owned by the switchers. A large part of the cable in the city plant is buried. This cable has been in service for a long period of time and as a result, is probably in a deteriorated condition. Due to the physical condition of this plant, a large portion is to be retired with no salvage. * * *
2.2 Central Office Equipment 2.21 The switchboard of the Overbrook exchange is a common battery switchboard of 200 line *246 capacity with 190 lines equipped. It was installed in 1928 and will be retired with approximately $500 salvage. * * *
2.3 Station Equipment 2.31 Most of the subscriber sets in town are obsolete and will be retired with no net salvage value anticipated. 2.32 Where are 17 new Kellogg 1,000 series telephones in town which will be retained. Their original cost was $397.80. 2.33 The subscriber set in the rural area belong to the switchers and will not be acquired. 2.4 Land and Buildings 2.41 The building in Overbrook is presently rented and will not be acquired. * * *
2.5 Vehicles and Work Equipment 2.51 The company owns a 1948 Dodge Power Wagon truck. Original cost was $407.49 and will be retired at approximately $300 salvage value. 2.52 The office and work equipment has an original cost of $521.71 and will be retained. 2.6 Material & Supplies 2.61 Total miscellaneous supplies which will be utilized in the new system - $916.44. On October 17, 1955, W E G's stockholders approved the purchase of the Overbrook exchange. On the next day, W E G and Overbrook Telephone Company (hereinafter called Overbrook) entered into an agreement providing for the sale of *247 Overbrook's properties to W E G for a base price of $25,000. The agreement provided, in part, as follows: SECTION 5. Adjustments. The base purchase price shall be subject to adjustment as provided in this section 5. Adjustments shall be made on the closing date on the basis of the most accurate estimates then available and final adjustment shall be made as soon as possible thereafter. (a) Capital Additions. The base purchase price shall be increased by an amount equal to the actual cost of capital additions to the System made between October 18, 1955, (hereinafter called the "Adjustment Date") and the closing date. Seller shall not make any expenditure for a capital addition to the System without the written consent of Purchaser. (b) Retirements, Loss and Damage. The base purchase price shall be reduced by an amount equal to the reasonable value of any part of the System retired from service, lost or damaged between the Adjustment Date and the closing date, and Seller shall promptly notify Purchaser with respect to each retirement, loss or damage. If the System is destroyed or seriously damaged before the closing date, either Seller or Purchaser may terminate this agreement *248 forthwith by written notice to the other. * * *
SECTION 6. Consents and Approvals. The obligation of Purchaser to purchase the System shall be conditioned upon: * * *
(b) The obtaining by Seller and Purchaser of all consents, permits and approvals required by law; (c) The obtaining by Purchaser of all agreements, order, franchises, certificates, consents and approvals which Purchaser may reasonably consider necessary for the operation of the System by Purchaser; * * *
SECTION 7. Non-Competition. Seller shall discontinue the operation of the System on the closing date, and shall not thereafter, without Purchaser's written permission, directly or indirectly furnish telephone service in the territory now served by the System or in the territory now served by Purchaser, so long as Purchaser shall continue to service subscribers within said territories. Pursuant to General Statutes Kansas Annotated § 66-131 and § 66-136 (1949), Overbrook applied to the Kansas Corporation Commission on October 21, 1955, for authority to cease operation as a telephone public utility, and W E G applied to the Commission for authority to operate in the territory then being served *249 by Overbrook. On January 25, 1956, both applications were granted. Pursuant to the October 18 agreement, a bill of sale was executed on January 1, 1956, which provided, in part, as follows: That the Grantor, * * * does * * * convey * * * to the Grantee * * * the following described properties * * * with all the rights, interests, privileges, appurtenances and facilities * * * to wit: * * *
IV All leases, easements, right of way, rights of ingress and egress and other interests in land, and all contracts and privileges granted to or owned or held by the Grantor, giving to or vesting in the Grantor the right (inchoate or complete), license or privilege to construct, operate or maintain upon lands owned or held by others any of the physical properties included in the System; and V All agreements and contracts granting privileges for railroad, power line, telephone or telegraph line crossings or parallels, and for joint use of occupancy of poles, and all right-of-way and encroachment agreements granted to or owned or held by the Grantor with respect to any of the physical properties included in the System; and VI All licenses, franchises, ordinances, authorizations, *250 privileges and permits owned or held by the Grantor, or heretofore granted, issued or executed to the Grantor or its assignors by United States of America, or by any state, or by any county, municipality, township, village or other political subdivision, or by any agency, board, commission or department of any of the foregoing, authorizing the construction, operation or maintenance of any of the physical properties included in the System, insofar as such licenses, franchises, ordinances, authorizations, privileges and permits permit of such conveyance or assignment; and VII All existing contracts relating to the furnishing or receiving by the Grantor of toll traffic, operator assistance, extended scope, and switching services from, through or for any of the telephone exchanges, lines or facilities included in the System; and * * *
IX All leases, easements, privileges, rights of way and other interests in land (including, without limitation, the right to cut and trim trees and shrubbery), in respect of land owned or held by the Grantor, to the extent necessary to give or vest in the Grantee the right, license or privilege to operate and maintain upon such lands owned or *251 held by the Grantor, and in or upon all streets, roads and highways abutting such lands, any part of the telephone exchanges, lines or facilities presently owned or operated by the Grantee, or included in the System; TO HAVE AND TO HOLD the System and every part thereof, whether real, personal or mixed, and whether tangible or intangible, to the Grantee, * * * W E G made the following entries on its books to record acquisition of Overbrook Telephone Company: Name
Debit
Credit
Telephone Plant Acquisi-
tion Adjustment
$13,004.16
Materials and Supplies
517.05
Land
500.00
Central Office Equipment
3,182.09
Station Apparatus
3,155.09
Pole Lines
6,189.24
Furniture and Office
Equipment
521.71
Vehicles & Other Work
Equipment
1,235.48
Depreciation Reserve
$ 2,456.23
Other Accounts Payable - Ross
Gault
25,848.59 The difference between the purchase price of $25,848.59 and the base price resulted from adjustments provided for in the October 18 agreement. The portion of the purchase price allocable to the telephone plant acquisition account was determined by petitioner's accountant in the following manner. The amount of the purchase price allocable *252 to the acquired tangible assets having a useful life of more than one year was considered to be $25,331.54 (gross purchase price of $25,848.59 less materials and supplies of $517.05). The appraised value of these assets was $24,189.13. The difference between the purchase price and the appraised value was allocated to each such asset on the basis of the ratio of its appraised value to the appraised value of such assets. After this adjustment was made for each asset, Overbrook's book value therefor was deducted, and the difference was placed in the acquisition account. [2]
The following table reflects petitioner's method: Appraised Fair
Purchase
Allocation
Market Value at
Price Allo-
Overbrook's
to Acquisi-
Asset
Date of Purchase
cable Thereto
Book Value
tion Account
Land
$ 1,000.00
$ 1,047.23
$ 500.00
$ 547.23
Central Office Equipment
2,625.00
2,748.97
2,634.82
114.15
Subscriber's Station Equipment
9,105.65
9,535.69
2,612.26
6,923.43
Outside Plant
9,093.12
9,522.58
5,125.20
4,397.38
Office Work Equipment
417.37
437.08
432.08
5.00
Vehicles
1,947.99
2,039.99
1,023.02
1,016.97
$24,189.13
$25,331.54
$12,327.38
$13,004.16
*253 On October 17, 1956, the Firm submitted to W E G the report of an engineering survey of the Osage Telephone Company, Osage, Kansas (hereinafter called Osage). The survey was conducted in the same manner as the Overbrook survey. Its appraisal of Osage's properties shows the following: Total
Average
Fair
Cost of
Construction
Replace-
Condition
Market
Asset
Construction
Overhead
ment Cost
Percent
Value
Aerial Cable
$11,509.72
$2,877.43
$14,387.15
65
$ 9,351.65
Aerial Cable (Ret.)
4,274.40
1,068.60
5,343.00
50
2,671.50
Direct Burial Cable
9,661.17
2,415.29
12,076.46
80
9,661.17
Duct Cable
4,824.50
1,206.13
6,030.63
60
3,618.38
Direct Burial Cable (Ret.)
784.30
196.08
980.38
50
490.19
Aerial Wire Town (Ret.)
7,941.25
1,985.31
9,926.56
60
5,955.94
Aerial Wire, Rural (Ret.)
11,119.10
2,779.78
13,898.88
50
6,949.44
Aerial Wire, Rural
20,114.50
5,028.63
25,143.13
70
17,600.19
Underground Duct System
12,080.00
3,017.50
15,097.50
50
7,548.75
Subscriber Stations
5,750.00
0
5,750.00
80
4,600.00
Subscriber Stations (Ret.)
17,372.00
0
17,372.00
60
10,423.20
Drops, Station Wiring & Pro-
tectors (Ret.)
29,651.15
7,412.79
37,063.94
50
18,531.97
Central Office Entrance (Ret.)
2,150.00
537.50
2,687.50
70
1,881.25
Drop Lift Poles (Ret.)
5,564.00
1,391.00
6,955.00
50
3,477.50
Land
2,500.00
0
2,500.00
100
2,500.00
Building
18,720.00
0
18,720.00
50
9,360.00
Central Office Equipment (Ret.)
20,000.00
1,000.00
21,000.00
50
10,500.00
Vehicles
5,000.00
0
5,000.00
40
2,000.00
Office & Work Equipment
2,100.00
0
2,100.00
70
1,470.00
Material & Supplies
3,630.40
0
3,630.40
3,630.40
Total
$132,221.53
*254 The following is an excerpt from the report: 2. EXISTING SYSTEM 2.1 Outside Plant 2.11 The system of the Osage City Exchange consists of city and rural plant. A large part of the cable in the city is buried. Most of the cable will be retained in the new plant. The telephone company owns rural plant serving 124 multiparty subscribers. Most of this plant will be retained since it has been re-built since 1951. The balance of rural plant which consists of grounded circuits on native poles will be retired with no salvage. * * *
2.2 Central Office Equipment 2.21 The switchboard of the Osage City Exchange is a common battery 3 position switchboard of 600 line capacity. It has 6 cords in the toll positions and 17 cords in each of the local positions. They are equipped for full selective 2 party divided automatic ringing. The power consists of 11 cells of Type EOS-7 Exide batteries, installed in 1949, charged by a G. E. Tungar Charger of 3 ampere capacity. There are two Holtzer Cabot interrupters on each for AC and DC operation. There are two ringing machines; one for normal operation and one for standby. They have a Cook A Type MDF with six hundred #100 Cook protectors and *255 eighty fuse type protectors. This equipment was installed in 1930 and will be retired with approximately $2,500 salvage. * * *
2.3 Station Equipment 2.31 There are 490 handsets in the Osage City Exchange which can be converted to dial operation. The balance of the telephones are obsolete and will be retired with no net salvage anticipated. * * *
2.4 Land and Buildings 2.41 The building in the Osage City Exchange is a fire-resistant brick building with a tile roof. It has a full basement in which is located the hot water central heating plant. This building is to be retained. The original cost was $8,713.41. The present day appraised value is approximately $18,720. The land consists of a tract 150 X 160 feet. The original cost was $598.40. The present day value of the land is approximately $2,500.00 2.42 The building in Miller will not be acquired. 2.5 Vehicles 2.51. The Osage City Exchange has two service trucks. The 1954 Ford has a utility body. The 1950 Chevrolet has a home-made body. Both trucks will be retained. The original cost of vehicles was $3,531.22. 2.6 Office and Work Equipment 2.61 The Osage City Exchange has office and work equipment with *256 an original cost value of $2,014.88 which will be retained. On July 15, 1956, W E G and the stockholders of Osage agreed to the purchase of all of the Osage stock by W E G for $105,000, and on October 27, 1956, W E G,s directors approved the acquisition of Osage by W E G. On September 5, 1957, Osage and W E G agreed that Osage should be merged with W E G. On September 12, 1957, Osage applied to the Kansas Corporation Commission for authority to cease operation as a telephone public utility, and W E G applied to the Commission for authority to proceed with the merger and to operate in the territory then being served by Osage. On October 16, 1957, both applications were granted. Petitioner made the following entries on its books to record the acquisition of Osage City Telephone Company: Asset
Debit
Credit
Telephone Plant Acquisition Adjustment
$36,798.52
Land
598.40
Buildings
9,713.41
Central Office Equipment
11,232.23
Station Apparatus
21,429.19
Pole Lines
38,026.87
Furniture and Office Equipment
2,114.33
Vehicles and Other Work Equipment
3,531.37
Materials and Supplies
3,825.02
Cash
15,136.80
Customer Deposits
$ 700.00
Reserves for Depreciation
$ 36,706.14
Telephone Plant Acquired
$105,000.00
*257 Petitioner used the same method in allocating the difference between the purchase price and the Osage book value as it did in the Overbrook transaction. Its method gave the following results Appraised Fair
Purchase
Market Value
Price
Allocation to
at Date of
Allocable
Osage's
Acquisition
Asset
Purchase
Thereto
Book Value
Acct.
Land
$ 2,500.00
$ 1,723.67
$ 598.40
$ 1,125.27
Buildings
9,360.00
6,453.41
4,206.90
2,246.51
Central Office Equipment
10,500.00
7,239.41
1,327.78
5,911.63
Station Apparatus
33,555.17
23,135.19
12,877.32
10,257.87
Outside Plant
69,205.96
47,715.23
28,163.18
19,552.05
Furniture & Office Equipment
1,470.00
1,013.52
1,014.90
(1.38)
Vehicles
2,000.00
1,378.93
1,751.18
(372.25)
Total
$128,591.13
$88,659.36
$49,939.66
$38,719.70
On August 17, 1956, petitioner purchased the service lines and telephone instruments of the Santa Fe Telephone Association for $6,682. These facilities were part of the Overbrook exchange and had been appraised at $7,718.49 by the Firm pursuant to an engineering survey such as those made for Overbrook and Osage. In each of the appraisals the fair market *258 value was determined by multiplying the replacement cost of the property in question by its remaining useful life expressed in terms of a percentage of the total useful life. In its 1957 corporate income tax return petitioner took a deduction for $1,945.75 as amortization. Of this amount, $1,300.42 was attributable to the Overbrook acquisition account of $13,004.16 and $645.33 was attributable to the Osage account of $38,719.70. Petitioner withdrew the following assets from service during the years in question and claimed the following losses: Year
Adjusted Basis
1957
Central Office Equipment (Overbrook)
$ 2,405.74
Station Apparatus (Overbrook)
2,385.10
Furniture & Fixtures (Overbrook)
381.98
Total
$ 5,172.82
Less: Salvage Value
2,081.98
Net Loss
($ 3,090.84)
4.5 miles pole line (Santa Fe)
1,809.72
2 miles pole line (Santa Fe)
656.98
Portion of Overbrook and Santa Fe acquisition accts. allo-
cable to retired assets
6,772.72
Total Loss
($12,330.26)
1959
Central Office Equipment (Osage)
$ 653.83
Station Apparatus (Osage) *
11,591.57
Pole Lines (Osage)
7,537.13
Portion of Osage acquisition acct. allocable to retired assets
$19,320.75
Add: Expense of removal
2,859.40
$41,962.68
Less: l
Salvage Value
346.20
Total Loss
($41,616.48)
*259 The Overbrook central office equipment was sold for $350 after it was removed from the system. There has been a gradual decline in the number of manual telephone systems in Kansas. At the time of acquisition of the Overbrook, Osage and Santa Fe facilities, petitioner intended to alter the facilities to provide dial service. It knew at such times that all of the facilities acquired would not be suitable for the dial operation. The Overbrook facility, including its Santa Fe lines and sets, was operated as a manual exchange until December 15, 1957, when it was converted to a dial system. This date was almost two years after acquisition of Overbrook and nearly one and one-half years after acquisition of Santa Fe. The Osage facility was operated as a manual exchange until May 3, 1959, when it was converted to a dial system. This was more than one and one-half years after acquisition by W E G. Petitioner did not intend to demolish either facility at the time of its acquisition. Opinion All issues except one turn on the adjusted bases of the assets involved. [3]
*260 Petitioner contends that the entire purchase price for the Overbrook, Osage and Santa Fe Facilities is allocable to their tangible assets, and thus any deductions for losses or depreciation must be measured by such amount. Respondent answers that the actual condition of the tangible property acquired militates against allocation to tangible assets of the total amounts paid; that the difference between the total purchase price and the portion thereof allocable to tangible assets is attributable to the acquisition of nondepreciable intangibles; and that the tangible assets for which abandonment losses were claimed had no adjusted bases at the time of the alleged abandonments. We need not decide whether any portion of the purchase prices of the Overbrook, Osage and Sante Fe acquisitions is allocable to good will; we need only determine whether any portion is allocable to nondepreciable intangibles. Our consideration of the Overbrook bill of sale and the Osage stock sale agreements leads us to conclude that petitioner did acquire intangibles in those transactions. [4]
*261 Finally, petitioner argues (1) that it did not use the names of the acquired exchanges and thus acquired no intangibles; and (2) that the acquisition accounts were placed on its books to comply with the requirements of the Federal Communications Commission, Rural Electrification Administration and State Corporation Commission. This first point is answered by the absence of any requirement that a business name be transferred in order for intangibles to pass, Estate of Masquelette v. Commissioner, 239 F. 2d 322, 326 (C.A. 5, 1956), The Toledo Newspaper Co., 2 T.C. 794 (1943); and the second by the lack of binding effect of the accounting procedures of regulatory bodies on the Commissioner of Internal Revenue. Gulf Power Co., 10 T.C. 852, 857 (1948); Bellefontaine Federal Savings & Loan Association, 33 T.C. 808, 811 (1960). Having found that a portion of the purchase prices was allocable to intangibles, we must now determine the proper allocation of those amounts to the tangibles and intangibles. Respondent's proposed allocation is as follows: (a) For the tangible assets not retired and abandoned, the fair market value on acquisition *262 was the transferor's original cost less depreciation; (b) for the tangible assets retired and abandoned where no fair market value is named, the adjusted basis of these assets was zero at the date of the alleged abandonment; (c) for the intangible assets, the fair market value was the total purchase prices less the amount allocated in (a) and (b). Although we have concluded, contrary to petitioner's contention, that less than the total purchase prices are allocable to the tangible assets acquired, we think respondent's allocation is incorrect. Petitioner argues that its allocation was based upon expert appraisal of the assets, that the method of valuation used in that appraisal was proper and that respondent did not present evidence to contradict its allocation. Under these circumstances, it argues, the presumption of correctness of the respondent's determination vanishes and petitioner's position must be sustained. Petitioner's premises logically lead to its suggested conclusion, but that conclusion must fail because the first premises will not withstand analysis. Petitioner's assumption that an asset's replacement cost multiplied by its remaining life is per se equivalent to *263 fair market value is unwarranted. Fair market value has been defined as the price at which property would change hands in a transaction between a willing buyer and a willing seller, with neither being under compulsion to buy or sell. O'Malley v. Ames, 197 F. 2d 256 (C.A. 8, 1952). Here many of the assets were acquired by the exchanges long before their acquisition by WEG. Furthermore, the facilities for which petitioner claims abandonment losses were considered unsuitable for a dial system. These factors of age and obsolescence, combined with the testimony of WEG's president that the number of manual exchanges has been decreasing rapidly in Kansas and the number of dial systems correspondingly increasing, causes us to conclude that the assets' fair market value, as such term is defined in O'Malley v. Ames, supra, cannot be tied to their replacement value. Philadelphia Steel & Iron Corporation v. Commissioner, 344 F. 2d 964 (C.A. 3, 1965), affirming per curiam a Memorandum Opinion of this Court; National Packing Corporation, 24 B.T.A. 952, 956 (1931); *264 see Fred Montesi, 40 T.C. 511, 519 (1963), affirmed without mention of this issue, 340 F. 2d 97 (C.A. 6, 1965). The cases of S.W. Tel. Co. v. Pub. Serv. Comm., 262 U.S. 276 (1923), and Bluefield Co. v. Pub. Serv. Comm., 262 U.S. 679 (1923), relied on by petitioner, are not controlling for Federal tax purposes. See Burnet v. Harmel, 287 U.S. 103 (1932). Moreover, the great disparity between the appraised or purchase prices and the salvage value, as reflected in the selling prices of certain assets sold by WEG during the years in question, casts doubt on its allocation. The following table reflects this disparity: Appraised Value
Purchase Price *
Sale Price &
Exchange & Asset
(1955)
(1-1-56)
Date (1957)
Overbrook
Central Office Equipment
$ 2,625.00
$ 2,748.97
$ 350.00
Station Apparatus
9,105.65
9,535.69
Furniture & Fixtures
417.37
437.08
Total
$ 12,148.02
$12,721.74
Value (including allocation from acquisition acct.) of portion of these assets
retained in WEG inventory
$4,917.00
Osage
(4-1-57)
(1957)
(1959)
Central Office Equipment
$ 10,500.00
$ 7,239.41
Station Apparatus
33,555.17
23,135.19
Pole Lines
69,205.96
47,715.23
$ 346.20 **
Total
$113,261.13
$78,089.83
*265 This disparity, coupled with the omission of any explanation for the substantial decrease in value in the relatively short period between purchase and sale, reinforces our belief that WEG's "appraised" and "purchase" values are unrealistic. But, on the other hand, we find that respondent's determination does not give effect to the value of the assets as installed facilities ready for operation as a going business with immediate earning capacity. The fair market value of the assets in such a state was undoubtedly more than if they were not installed. Philadelphia Steel & Iron Corp. v. Commissioner, supra. Where both parties ascribe unrealistic values to the assets in question, we are faced with a task in which precision is unattainable. The following language from Colonial Fabrics, Inc. v. Commissioner, 202 F. 2d 105, 107 (C.A. 2, 1953), mirrors that imprecision: For finding market value is, after all, something for judgment, *266 experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation. After taking into consideration the original cost of and depreciation taken on the assets of the acquired telephone systems, together with their age, condition and utility, and using our best judgment, we have determined that the purchase prices for the facilities should be allocated to the tangible assets, as of the date of purchase, [5] as follows: Exchange
Asset
Amount
Overbrook
Land
$ 1,000.00
Central Office Equipment
1,390.00
Subscriber Stations &
Equipment
3,970.59
Outside Plant (Pole
Lines)
6,965.60
Office Equipment
362.80
Vehicles
300.00
Osage
Outside Plant (Pole
Lines)
33,795.81
Land
2,500.00
Buildings
4,291.06
Subscriber Station &
Equipment
15,327.00
Central Office Equipment
$ 2,964.58
Office Equipment
1,217.88
Vehicles
1,901.38
Santa Fe
6,682.20 After making adjustments *267 to reflect the adjusted basis of the Overbrook assets to WEG and depreciation allowable thereon, we conclude that the value of the central office equipment, station apparatus, and furniture and fixtures salvaged and placed in WEG's inventory is $2,019.42 at the time of their alleged abandonment. Of this amount $350 is attributable to the salvage value of the central office equipment. Since none of the Osage assets abandoned by WEG were available for future use, the total bases of such assets, as determined supra and as adjusted for depreciation allowed or allowable after acquisition, is the measure of the loss, diminished by the amount of $346.20 realized as salvage. Finally, with regard to the Santa Fe facilities, it is clear from the contract of sale and the nature of the assets involved that the entire purchase price is attributable to tangible assets. The Santa Fe assets were dependent upon and supplemental to the Overbrook exchange and therefore had no value as a going concern in and of themselves. However, petitioner's claimed loss does not take into account depreciation on the assets between their acquisition and retirement, as required by section 1016(a)(2)(B) of the Code. *268 The remaining issue for consideration is whether petitioner abandoned the assets in the years in which losses therefor are claimed. Respondent contends that petitioner has not proved abandonment or, in the alternative, if there is such proof, the losses must be disallowed on the ground that petitioner never intended to use the assets in its business at the time of their acquisition. Petitioner argues that abandonment occurred when the facilities of which the assets were a part were converted from manual to dial operation, and that it intended to and did use the assets in the manual system until that time. The evidence shows that the assets in question were unsuitable for use in a dial system. Petitioner's witnesses testified in detail that technology prevented the use of some assets of the acquired exchanges on conversion to dial operation, and that the assets so abandoned were "set aside." Under the circumstances we hold that since the assets were not useable by petitioner because of obsolescence after the conversion to dial the abandonment occurred on conversion. Respondent's reliance upon Ewald Iron Co., 37 B.T.A. 798 (1938) and O. P. Lutz, 29 T.C. 469 (1957), *269 is misplaced. In the Ewald Iron case the taxpayer, an integrated producer of bolts, agreed to discontinue its manufacturing operation and sell the raw materials for bolt manufacturing to a third party; however, if the third party had refused to buy the raw material, the taxpayer would have resumed manufacture on the machines it set aside. The loss issue in the Lutz case turned on the fact that the taxpayer could have used the asset in its business operations in a year after the claimed year of abandonment. Respondent next argues that the Santa Fe facilities were acquired by WEG on December 31, 1957, and abandoned on that same day. This situation, he contends, is analogous to acquisition of a building with the intent to demolish, in which case no loss is allowed on the demolition. Section 1.165-3, Income Tax Regs. Although an exhibit introduced by petitioner does show that acquisition and abandonment were recorded on WEG's books on December 31, 1957, the facts do not support the veracity of the exhibit. By an agreement dated August 17, 1956, WEG purchased the telephone equipment and facilities of Santa Fe, and they were operated thereafter as part of the *270 Overbrook system. Furthermore the only authority cited by respondent as support for his analogy, Columbus Brick & Tile Co., 26 B.T.A. 794 (1932), is clearly distinguishable on the ground that the taxpayer therein never intended to use the machinery in question in the business operation, since the assets were in the process of being dismantled at the time of the taxpayer's acquisition. In the instant case WEG did not convert Santa Fe to dial until nearly a year and a half after acquisition. Since WEG was required to continue manual telephone service until conversion, it used the properties in question until that time. Nevertheless, respondent correctly points out that while WEG claimed an abandonment loss for all of the Osage subscriber station equipment it actually retained in the dial system 250 of the old subscriber sets. After considering the sets retained and abandoned, we hold that petitioner's adjusted basis for the abandoned sets on the date of their acquisition was $13,326.95. Respondent, relying on United California Bank, 41 T.C. 437, affirmed per curiam, 340 F. 2d 320 (C.A. 9, 1965), argues finally that the loss claimed on the *271 Overbrook central office equipment must be disallowed in view of the subsequent sale of the asset. We agree. To hold otherwise would result in an ordinary loss on the abandonment and a capital gain on a subsequent sale when the asset involved is property used in a trade or business. To reflect the adjustment resulting from the conceded issue and the determinations made herein, Decision will be entered under Rule 50. Footnotes
1. This case was heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on February 11, 1965. The case was later reassigned by the Chief Judge to Judge Kern and then to Judge Dawson↩. Notice was given to the parties that a request for rehearing or reargument might be filed within 30 days from the date of the first reassignment. No such request has been received by the Court.
a. Outside wire on telephone poles. ↩
b. Telephone cable buried in the ground. ↩
c. Telephone instruments: hand set (transmitter and receiver in one instrument), desk-wall (transmitter and receiver not in one instrument) and a pay station. ↩
d. Wiring between pole and subscriber station and terminal box. ↩
e. The cable from the riser pole and its grounding unit. ↩
f. A 200-line combination magneto common battery switchboard. ↩
g. 1948 Dodge truck with four-wheel drive. ↩
h. Typewriter, hand adding machine, lamp, table, pictures, chairs, bed, bedding, mattress and springs.↩
2. Regulations of the Kansas Corporation Commission required petitioner, as an acquiring utility, to carry over to its books the book value of any acquired utility's assets. That book value was the acquired utility's original cost for the assets less any depreciation.↩
*. Subscriber stations, drops, station wiring, and protectors.↩
3. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *
SEC. 167. DEPRECIATION. (a) General Rule. - There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business, or * * *
SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis * * * SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, * * * SEC. 1016. ADJUSTMENTS TO BASIS. (a) General Rule. - Proper adjustment in respect of the property shall in all cases be made - * * *
(2) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent of the amount - * * *
Income Tax Regs. § 1.165-2 Obsolescence of nondepreciable property. * * *
(c) Cross references. For the allowance under section 165(a) of losses arising from the permanent withdrawal of depreciable property from use in the trade or business or in the production of income, see § 1.167(a)-8. For provisions respecting the obsolescence of depreciable property, see § 1.167(a)-9. * * * § 1.167(a)-3 Intangibles. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * * § 1.167(a)-8 Retirements. (a) Gains and losses on retirements. For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. The tax consequences of a retirement depend upon the form of the transaction, the reason therefor, the timing of the retirement, the estimated useful life used in computing depreciation, and whether the asset is accounted for in a separate or multiple asset account. Upon the retirement of assets, the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss: * * *
(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition. * * *
(c) Basis of assets retired. The basis of an asset at the time of retirement for computing gain or loss shall be its adjusted basis for determining gain or loss upon a sale or other disposition as determined in accordance with the provisions of section 1011 and the following rules: * * *
§ 1.167(a)-9 Obsolescence. The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. * * * § 1.1012-1 Basis of property. (a) General rule. In general, the basis of property is the cost thereof. The cost is the amount paid for such property in cash or other property. * * *↩
4. We note only a few examples of such intangibles. The acquisitions provided WEG with a favorable location in the sense that only it could provide telephone service in the geographical area. Even more important is the fact that petitioner was assured of patronage and, as a public utility, was assured of a certain percentage return on its investment. Petitioner acquired all easements, privileges, rights-of-way, rights of ingress and egress, and permits held by the acquired exchanges. While it is true that section 66-136, Gen. Stats. Kan. Ann. (1949), required approval by the Kansas Corporation Commission for any valid franchise transfer, the fact remains that WEG could obtain the franchise only if the exchange operating in the area was willing to transfer it. This belies petitioner's inference that these advantages passed to it solely from the State and not from the sellers of the facilities.↩
*. This figure is the sum of the transferor's net book value and the portion of the acquisition account allocated by WEG to the asset. ↩
**. This figure was not allocated to any particular one of the three types of assets.↩
5. Petitioner treated the value of the Osage assets on liquidation of Osage into WEG as equal to the purchase price of the stock. See section 334(b)(2), Internal Revenue Code of 1954↩.