NORMAN L. and MARGARET C. BARLOW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE. ARTHUR H. HESBON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE.
Barlow v. Commissioner
Docket Nos. 878-71, 879-71.
United States Tax Court
T.C. Memo 1975-316; 1975 Tax Ct. Memo LEXIS 60; 34 T.C.M. (CCH) 1373; T.C.M. (RIA) 750316; October 20, 1975, Filed Norman L. and Margaret Barlow, pro se. Arthur H. Hesbon, pro se. J. E. Britt, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a deficiency of $23,627.12 in Norman L. and Margaret C. Barlow's Federal income tax for 1966, and a deficiency of $29,462.52 in Arthur H. Hesbon's Federal income tax for 1966. The issues for decision are: 1. Whether the distribution of undivided interests in 676 acres of land on November 28, 1966, by Oro-Vista *61 Enterprises, Inc., to its two shareholders in exchange for all the stock of the corporation resulted in a complete liquidation of the corporation taxable under section 331. [1]
2. The fair market value of the undivided interests in the land on the date of distribution. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Norman L. and Margaret C. Barlow [2] resided in Oroville, California when they filed their petition. Petitioner Arthur H. Hesbon ("Hesbon") resided in Colusa, California when he filed his petition. In 1941 Norman L. Barlow ("Barlow") acquired 800 acres of undeveloped land near Oroville Reservoir, Oroville, California. In the 1950's his former wife acquired an undivided one-half interest in the land in a divorce settlement. Subsequently, the State of California condemned 124 acres of the property which lay adjacent to the reservoir, leaving Barlow with an undivided one-half interest in 676 acres of land. *62 Barlow's former wife thereafter sold her undivided one-half interest to Gordon Realty. In December 1963, Barlow and Hesbon incorporated Oro-Vista Enterprises, Inc. ("Oro-Vista") in Nevada. Hesbon transferred certain mining claims to the corporation in exchange for 50 percent of Oro-Vista's stock, and Barlow transferred his undivided one-half interest in the 676 acres of land to the corporation in exchange for the other 50 percent of the stock. The mining claims were subsequently written off as worthless. The only asset of any value remaining in the corporation in 1966 was the land. Petitioners had originally hoped to develop the land and they utilized a corporation to limit their personal liability. Because petitioners did not have sufficient funds to develop the property themselves, and they could not persuade Gordon Realty to advance funds for that purpose, petitioners were unable to pursue their development plans. As a result, petitioners decided to transfer the property out of the corporation to themselves and try to sell it. On November 28, 1966, Oro-Vista distributed the undivided one-half interest in 676 acres of land to Barlow and Hesbon in exchange for all their stock *63 in the corporation, each shareholder receiving an undivided one-quarter interest. Oro-Vista filed its final corporate income tax return for the year 1966. On the date that Oro-Vista distributed the property to its shareholders, Barlow's adjusted basis in his 50 percent interest in the corporation was $4,865 and Hesbon's adjusted basis in his 50 percent interest was $4,020. Barlow and Hesbon failed to file elections under section 333 providing for a non-taxable liquidation of the corporation. Petitioners were unable to sell their interests in the land and still owned them at the time of trial. Gordon Realty was unwilling to join with petitioners in selling the whole interest in the property. Petitioners had insufficient funds to bring a partition action, and negotiations to sell their interest to Gordon Realty proved unproductive. The real estate market for recreational land on the Oroville Reservoir peaked in 1967 with the completion of the Oroville Dam. After distribution of the land to them in November 1966, petitioners listed it with several brokers. At one time they listed it with C. W. Wise Real Estate Company at an asking price of $1,125 an acre. In March 1966, at a Board *64 of Directors' meeting Hesbon stated he would not sell his interest in the land for less than $1,000 an acre. In June 1966, the Board of Directors agreed it would accept a purchase price between $1,000 and $1,500 an acre. It appears that all these asking prices were unrealistically high. Although land adjacent to petitioners sold from $480 to $1,500 an acre during the speculation fever, much of it apparently returned to the original owners through defaults on purchase payments. The State of California had condemned a 300 foot wide strip of land all the way around Oroville Reservoir. Only a small portion of the 676 acre tract was adjacent to the State-owned lake front. There were no public roads through or along the property. After the property was distributed to the petitioners, environmental restraints were imposed on subdividing the property. The record reveals only two sales of property at approximately the same time that Oro-Vista distributed its assets to petitioners. In October 1966, a 158.01 acre tract was sold for $490 per acre and a 160.99 acre tract was sold for $480 per acre. These two plots of land were immediately north of petitioners' property and no portion of them *65 was adjacent to State property bordering the lake. In February 1966, 108 acres of land with extensive lake access were sold for $1,389 per acre, and in April 1966, 200 acres of land with sizable lake access were sold for $1,300 per acre. In February 1967, 319 acres of land not adjacent to the lake, but with a public road running through it, sold for $500 per acre. Apart from their proximity to the lake, there is no indication in the record whether there were any topographical differences in the various tracts of real estate sold. Gerald R. Davis ("Davis"), an internal revenue agent, appraised the property for respondent at $750 per acre. His appraisal was based on knowledge of the Oroville area, reference to other property sales, contact with the Butte County assessor's office regarding assessed values for taxes, Oro-Vista's corporate minutes reflecting amounts petitioners hoped to realize on the sale of the property, and the fact that petitioners' interest was an undivided ownership interest. Davis' appraisal notes that while he draws in part on assessed values by the Butte County assessor's office, that office never physically inspected the property, relying instead on indirect *66 methods of valuation. As such, he is unable to vouch for the accuracy of their methods. [3] His report also mentions that it is extremely difficult to denote fair market value of property in the Oroville Reservoir area with one figure for the entire tract. When Davis appraised the property, he assumed in his calculation that the co-owner would be willing to sell it, so that it could be sold whole. Davis had never before appraised such a large tract of real estate. Further, none of the comparable sales he used in his analysis were of property that was divided in ownership. ULTIMATE FINDING OF FACT The fair market value of each petitioner's undivided one-quarter interest in the Oroville Reservoir property was $42,250. OPINION 1. Taxation of Liquidating Distributions.
Petitioners contend that they should not be required to recognize income when their corporation on liquidating distributed land to them in exchange for all their stock. They argue that since no "money" changed hands, the corporate liquidation is not a taxable event. Respondent asserts *67 that Oro-Vista's distribution to Barlow and Hesbon in exchange for all their stock was a taxable liquidation under section 331(a). Respondent notes that while petitioners could have elected nonrecognition treatment under section 333, they failed to comply with required procedures. In 1963 Barlow and Hesbon incorporated Oro-Vista. Hesbon transferred certain mining claims to the corporation in exchange for 50 percent of its stock, and Barlow transferred his undivided one-half interest in Oroville Reservoir property for the other 50 percent of the corporation's stock. Petitioners expected to develop the land, reap financial benefits from its rental or sale, and insure limited liability through use of the corporate form of enterprise. By 1966, Oro-Vista had written off Hesbon's mining claims as worthless. In November 1966, petitioners decided to take the unimproved real estate out of the corporation and try to sell it themselves, having given up any development plans. Each petitioner exchanged his 50 percent stock interest in Oro-Vista for an undivided one-quarter interest in the 676 acre tract of land. Hesbon had in effect exchanged his interest in certain mining claims for an interest *68 in land, while Barlow had received a return of property that had appreciated in value. Section 331(a)(1) provides that "[amounts] distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock." The parties agree that the distribution was in complete liquidation of Oro-Vista and in exchange for stock. Since the stock of the corporation was a capital asset in petitioners' hands, petitioners were required to recognize long-term capital gain equal to the excess of the fair market value of the land received over their basis in the stock exchanged. Section 1001. Gain must be recognized unless specifically otherwise provided in the Internal Revenue Code. Section 1002. Congress did provide a nonrecognition provision in section 333. Section 333 allows shareholders of a corporation with appreciated property, but without earnings and profits, to elect to liquidate the corporation without recognition of gain. Section 333(d) gives respondent legislative authority to prescribe regulations for the making and filing of an election under section 333. "'Legislative' regulations are entitled to even more than the usual 'great weight' accorded *69 Treasury Regulations." Tri-City Dr. Pepper Bottling Co.,61 T.C. 508, 514 (1974). Section 1.333-3, Income Tax Regs. provides that the election must be filed on Form 964 within 30 days after adoption of the plan of liquidation. "Under no circumstances shall section 333 be applicable to any shareholders who fail to file their elections within the 30-day period prescribed." Section 1.333-3, Income Tax Regs. The courts have consistently upheld this requirement. Posey v. United States,449 F. 2d 228 (5th Cir. 1971); Virginia E. Ragen,33 T.C. 706 (1960). Petitioners failed to comply with those specific requirements. As such they are unable to benefit from the nonrecognition provisions of section 333. Posey v. United States,supra;Virginia E. Ragen,supra.Petitioners' argument that they need not recognize gain because they received property instead of money or something equivalent to money is without merit. The amount of gain realized on the disposition of property is the sum of any money received, if any, plus the fair market value of property (other than money) received. Section 1001(b). *70 The argument that they received only that which they had previously conveyed to the corporation, even were it relevant, is factually erroneous. Hesbon conveyed mining interests and only Barlow conveyed land. Moreover, although Barlow conveyed an undivided one-half interest in the land to the corporation and received only an undivided quarter interest in the land from the corporation, what he received from the corporation was worth more than what he paid for his entire interest in the land originally, and he is taxable on the appreciation in value. The corporate liquidation is a taxable event under section 331(a) which requires recognition of gain equal to the excess of the fair market value of the asset distributed by Oro-Vista over petitioners' respective adjusted bases in their stock. 2. Valuation.
Petitioners contend that the fair market value of an undivided quarter interest in the 676 acres of Oroville Reservoir land was $27,040 on November 1966, and respondent alleges it was $126,760. We have found that the fair market value of each such interest on November 1966 was $42,250. The fair market value of property is a question of fact to be determined from all the facts *71 and circumstances of the case. Newaygo Portland Cement Co.,27 B.T.A. 1097, 1106 (1933), affirmed 77 F. 2d 536 (D.C. Cir. 1935). It depends on the "* * * judgment, experience, and reason on the part of the trier * * *." Colonial Fabrics v. Commissioner,202 F. 2d 105, 107 (2nd Cir. 1953), affg. a Memorandum Decision of this Court, cert. denied 346 U.S. 814 (1953). Barlow and Hesbon did little to document and support their appraisal of the land except to claim at trial that the property had no value. While an owner of property can testify as to its value, the weight of that testimony must be considered along with other introduced evidence. Respondent's appraiser, Revenue Agent Davis, testified that he did not personally view the property to be appraised, that he had never appraised such a large plot of land before, that none of the alleged comparable sales were sales of undivided ownership interests, and that he was unaware that Gordon Realty, which owned the other undivided one-half interest in the property, was unwilling to sell. In his Revenue Agent's report, Davis indicated difficulty in arriving at a fair market *72 value for this property interest. Taking into consideration all the facts and circumstances, and using our best judgment on a rather meager record, we have found as a fact that each quarter interest in the property was worth $42,250. The highly problematical chances of ever subdividing the property or putting it to any economic use, in view of environmental obstacles, as well as the intransigence of the remaining co-owner Gordon Realty, tend to depress the marketable value of petitioners' individual interests in the land well below what the intrinsic value of the acreage might have been without such depressants. Petitioners also claim that their constitutional rights were violated on a number of grounds, including, interalia, that the corporate liquidation was not a taxable event because there was no income within the intent of the Constitution, and that their constitutional rights were violated when this Court refused to allow an attorney, whom they had instructed not to become admitted to practice before the Tax Court, to represent them. While we appreciate petitioners' sincerity and deep convictions in raising their constitutional objections, we have concluded that *73 they are entirely without merit. It has long been established that a shareholder must recognize gain, if any, on a corporation's complete liquidation. Petitioners have failed to cite any authority for their proposal of nonrecognition. As for petitioners' claim that they were not properly represented, their counsel was advised that upon filing an application for admission, he would be entitled to represent petitioners. But petitioners directed their attorney not to file such an application. The Tax Court is vested with authority to prescribe rules for admission to practice before it. See Goldsmith v. Bd. of Tax Appeals,270 U.S. 117 (1926). Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. Margaret C. Barlow is a party herein solely by having filed a joint return with Norman L. Barlow.↩
3. The assessed value for the property on March 7, 1966 was $200 an acre for 640 acres and $500 an acre for 36 acres.↩