JOHN L. JOHNSON AND PATRICIA JOHNSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnson v. Commissioner
Docket No. 6274-86
United States Tax Court
T.C. Memo 1989-394; 1989 Tax Ct. Memo LEXIS 393; 57 T.C.M. (CCH) 1135; T.C.M. (RIA) 89394; July 31, 1989
Bill Thomas Peters, for the petitioner. Paul L. Dixon, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Year
Deficiency
1978
$ 10,118
1979
$  7,269
1980
$ 10,268
1981
$  8,726
Respondent also determined that the deficiencies constitute substantial underpayments attributable to tax motivated transactions *395 within the meaning of section 6621(c) [formerly section 6621(d)]. [1]
The issues are: (1) the extent of the interest of petitioner John L. Johnson in certain unpatented mining claims at the time the claims were donated to Brigham Young University (BYU); (2) the fair market value of his interest in the claims when they were donated to BYU; and (3) whether any underpayments in petitioners' taxes are attributable to tax motivated transactions within the meaning of section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits associated therewith are incorporated herein by reference. Petitioners, John L. and Patricia Johnson, husband and wife, resided in Salt Lake City, Utah, at the time of filing their petition. Their joint income tax returns for 1978 through 1981 were timely filed with the Internal Revenue Service. Petitioner John L. Johnson who is hereinafter referred to as petitioner *396 in the singular has a degree from the University of Utah in economics and statistics but during the years at issue he was primarily engaged in the sale of life insurance and stocks. However, from about 1970 through the date of trial in 1987 he was also involved with Victor Sorbe in the acquisition of mining claims located in the Gold Circle Mining District of Elko County, Nevada. Originally they undertook to acquire the claims with the intention of possibly organizing a mining company and having a Regulation A stock offering. Their efforts included the researching of public records, the staking of claims and the negotiation of contracts to purchase or lease adjacent claims. At trial, they estimated that at one time they had "tied up" seventy to seventy-five percent of the area in which most of their claims were located. The five claims involved in this case are known as CR 1, CR 2, Stormy Days 1, Stormy Days 2, and Stormy Days Fraction. They are located in the Gold Circle Mining District approximately one mile northeast of Midas, Nevada. CR 1, CR 2, Stormy Days 1 and Stormy Days 2 are rectangular claims with each having dimensions of 1,500 feet by 600 feet. CR 2 is the most *397 easterly of the claims with its 1,500 foot borders running generally east and west and its 600 foot borders running generally north and south. CR 1 lies immediately to the west of CR 2 and shares a 600 foot border with CR 2. Immediately to the south of CR 1's 1,500 foot southern border is Stormy Days 1. Stormy Days 2 lies immediately to the south of Stormy Days 1 and the two claims have a common 1,500 foot border. Stormy Days Fraction is an odd shaped claim with approximate dimensions of 400 feet by 600 feet. It lies to the south of Stormy Days 2 and has a common border of about 400 feet with the western part of the southern border of Stormy Days 2. CR 1 and CR 2 were staked by petitioner and Mr. Sorbe on March 27, 1971. A notice of location for each of these claims was filed by petitioner or Mr. Sorbe with the Elko County Recorder. However, each notice reflects Charles Rognon as the locator and is signed by Charles Rognon. The handwritten location certificates for CR 1 and CR 2 were prepared by petitioner and signed by Charles Rognon on June 27, 1971. The location certificates were filed with the Elko County Recorder by petitioner or Mr. Sorbe on June 30, 1971. In 1971 *398 Charles Rognon was a friend and client of petitioner. He signed the location certificates for CR 1 and CR 2 at the request of petitioner. He was used by petitioner as a nominee on the certificates in order to avoid a disclosure of the concentrated activities of petitioner and Mr. Sorbe with respect to claims in the area. Shortly after signing the location certificates Charles Rognon transferred CR 1 and CR 2 to petitioner by a quitclaim deed which was never recorded. Mr. Rognon has never asserted any interest in CR 1 and CR 2. Stormy Days 1, Stormy Days 2 and Stormy Days Fraction were located or staked by petitioner and Mr. Sorbe on May 30, 1971. On June 28, 1971, they prepared a notice of location for each of these claims, listing Victor Sorbe and petitioner as the locators with a fifty percent interest in each. The notices were recorded on June 29, 1971 with the Elko County Recorder. As the years passed after the location of the five claims Mr. Sorbe and petitioner began to feel that they should reduce the number of their claims and perhaps should pull out of the area entirely. However, at the time of trial, Mr. Sorbe still owned some Midas Belle claims which are adjacent *399 to the Stormy Days claims on the west. He also owned other claims located in the general area but he testified that at the end of 1979 he was not particularly interested in the five claims at issue and he felt that he had accumulated more mining claims than he could look after. In any event at some date prior to petitioner's donation of the claims to BYU, Mr. Sorbe verbally transferred all of his interest in the claims to petitioner. The record contains no specific evidence of the nature and amount of the consideration, if any, for the transfer. On December 29, 1978, petitioner quitclaimed the five mining claims to BYU, an organization qualified to receive charitable donations within the meaning of section 170(c). Mr. Sorbe was required by the University to join in the quitclaim deed since he was still an owner of record of a one-half interest in the Stormy Days claims even though he no longer asserted any interest in such claims. On their joint 1978 income tax return petitioners valued the donated claims at $ 100,000 and claimed a charitable deduction in the same amount. The charitable deduction claimed on the 1978 return exceeded the applicable statutory limits and was carried *400 forward by petitioners to their returns for 1979, 1980 and 1981. To arrive at a value of $ 100,000 for the claims, petitioner assumed that a vein structure found in the Elko Prince Mine which is located to the north of CR 1 and CR 2 extended through his claims. He estimated the average width of the vein at seven feet and its depth at 100 feet. He also estimated that the length of the Elko Prince Vein on his claims was 800 to 850 feet. With these estimates he concluded that there was 48,000 tons of gold and silver bearing ore in that portion of the vein on his claims. By using the average value of gold and silver per ton of ore from the Elko Prince Vein of $ 100 petitioner estimated a total value of $ 4,800,000 for his claims. However, according to his testimony "to be conservative", he took only ten percent of that estimate or $ 480,000 and then further reduced it to approximately 25 percent which he rounded off to the $ 100,000 claimed on the 1978 return. In 1984, BYU entered into a lease purchase agreement with Exxon Corporation covering the five claims received from petitioner. The total lease purchase price under the agreement was $ 86,000 but only the initial payment of *401 $ 500 was made before Exxon permitted its option rights to extend the lease or purchase the claims to expire. In the notice of deficiency, respondent determined that the fair market value of the donated claims was $ 2,500 or $ 500 for each. OPINION Under section 170 an individual is allowed a so-called charitable deduction for contributions made to qualifying donees subject to certain percentage limitations and with a carry-over to subsequent years for any excess. Section 170(b) and (d). The parties agree that BYU is a qualifying donee for purposes of section 170. The parties also agree that a charitable contribution can be made in property or an interest in property. They disagree as to the extent of petitioner's interest in part of the property actually contributed and the value of all such property. These are questions of fact on which petitioner has the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). (1) Extent of Petitioner's Interest in Stormy Days Claims. First respondent contends that Mr. Sorbe's attempt to verbally transfer *402 his fifty percent interest in Stormy Days 1, Stormy Days 2 and Stormy Days Fraction to petitioner was void and of no effect and consequently petitioner had only his original fifty percent interest in these claims to donate to BYU. The parties agree that the extent of ownership in the property is to be determined by reference to the laws of Nevada. United States v. Mitchell, 403 U.S. 190, 197 (1971). Section 517.380 of Nev. Rev. Stat. Ann. (Michie 1986) provides that conveyances of any mining claims after December 12, 1862 "shall require the same formalities and shall be subject to the same rules of construction as the transfers and conveyances of other real property." Section 111.205 of Nev. Rev. Stat. Ann. (Michie 1986) further provides that "No estate or interest in lands * * * shall be created, granted, assigned, surrendered or declared after December 2, 1861, unless by act or operation *403 of law, or by deed or conveyance, in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same * * *." Respondent contends that the above statutes contain the usual provisions of a typical statute of frauds and hence the verbal transfer of Mr. Sorbe's fifty percent interest in the Stormy Days claims to petitioner is void as a matter of law. However, the Supreme Court of Nevada has held in a case involving a similar section of the Nevada statutes that "[t]he defense of the statute of frauds is personal, and available only to the contracting parties or their successors in interest" and that a stranger to an oral agreement is without standing to seek a declaration that the agreement is void. Harmon v. Tanner Motor Tours of Nevada, Ltd., 79 Nev. 4, 377 P.2d 622, 628 (1963). The statute involved in Tanner is section 111.222 Nev. Rev. Stat. Ann. (Michie 1986) which declares that agreements not to be performed within one year, promises to *404 answer for the debt of another, and promises made upon consideration of marriage "shall be void, unless such agreement, or some note or memorandum thereof expressing the consideration, be in writing, and subscribed by the party charged therewith." Although the statute raised by respondent in the case before us is different, we see no reason why the holding in Tanner would not be equally applicable to a transfer of an interest in land located in Nevada. From the record before us we have found that Mr. Sorbe made a verbal transfer of his fifty percent interest in the Stormy Days claims to petitioner and that such transfer has been recognized at all times by both petitioner and Mr. Sorbe. We have also found that Mr. Sorbe signed the quitclaim deed to BYU at the request of BYU and merely to clear the title to the claims because Mr. Sorbe was still a holder of record. We conclude therefore that since respondent was not in privity with either petitioner or Mr. Sorbe he has no standing under Nevada law to raise the statute of frauds and consequently for our purposes petitioner is considered as being the owner of one hundred percent of the Stormy Days claims at the time he contributed *405 them to BYU. (2) Value of Mining Claims on the Date of their Donation. If a charitable gift is made in property other than money, the amount of the contribution is the fair market value of the property as of the date contributed reduced when necessary as provided in section 170(e)(1). Section 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Section 1.170A-1(c)(2), Income Tax Regs. Respondent's determination as to the fair market value is presumptively correct and the burden of proving a higher value rests on petitioners. Rule 142(a). Fair market value of property as of any given date is a question of fact to be resolved by considering and weighing all relevant evidence. Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). *406 Fair market value is also a question of judgment rather than mathematics. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Duncan Industries, Inc. v. Commissioner, 73 T.C. 266 (1979). Therefore, by its very nature, valuation is an approximation derived from all the evidence. Helvering v. Safe Deposit Co., 316 U.S. 56 (1942); Silverman v. Commissioner , 538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Furthermore, while we must consider the entire record we have broad discretion to determine what facts are most important in reaching a determination because "finding market value is, after all, something for judgment, experience and reason." Colonial Fabrics v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), affg. a Memorandum Opinion of this Court. In making a determination of fair market value we may rely upon the opinion of experts. *407 Estate of O'Connell v. Commissioner, 640 F.2d 249 (9th Cir. 1981), affg. in part and revg. and remanding in part a Memorandum Opinion of this Court; Palmer v. Commissioner, 523 F.2d 1308 (8th Cir. 1975), affg. 62 T.C. 684 (1974); Estate of Piper v. Commissioner, 72 T.C. 1062 (1979). Opinion evidence, however, must be weighed in the light of the witness's qualifications and with regard to all other relevant evidence. Anderson v. Commissioner, 250 F.2d 242 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. In doing so, we may embrace or reject opinion testimony if, in our best judgment, such action is proper. Helvering v. National Grocery Co., 304 U.S. 282 (1938); Silverman v. Commissioner, supra at 933; Palmer v. Commissioner, supra at 1310. If warranted, we may choose the opinion in toto of one expert witness at the expense of another or others. However, if we are satisfied that a significant error exists in the expert testimony we find most persuasive an appropriate adjustment is necessary. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). *408 In support of his valuation petitioner relies upon the testimony of three individuals namely: himself, his friend and business associate, Victor Sorbe, and Dr. Edward Bloomstein. Respondent relies upon the testimony of Dr. Charles Miller. With respect to his valuation of the five claims petitioner testified he felt that $ 100,000 "was a value that would be ultra, ultra-conservative, that nobody would question." We are unable to adopt his valuation for the following reasons. First the record contains no evidence which tends to support a finding that petitioner is qualified by education, training or experience to testify as an expert in the evaluation of mining claims. He testified that he was taught how to locate and stake mining claims and how to research records to determine the existence of a vein structure by a geologist by the name of Sherman Jensen. He, however, failed to explain how the ability to locate and stake a mining claim qualifies an individual to value the claim and his implication that the existence of a vein on a claim can be determined by a research of records was contradicted by his own witness, Dr. Bloomstein, who testified that the existence of a vein could *409 only be determined by drilling. Secondly, petitioner's valuation is based on certain assumptions and estimates which are not supported by the record. For instance even though the record contains no such proof he assumed that the vein structure found in the Elko Prince Mine extended through his claims. He then estimated the width and depth of the Elko Prince vein on his claims and computed a tonnage of 48,000 tons in recoverable ore. By contrast Dr. Bloomstein testified that from his experience he "guessed" there was an extension of the Elko Prince vein to petitioner's claims but the only way to confirm the presence of the vein and its dimensions was by drilling. Furthermore, even if we were to assume that petitioner has correctly estimated the recoverable tonnage on the claims, his valuation would still be faulty because he failed to take into account the obvious costs of mining and developing the property which any potential purchaser would have to consider. Under the above circumstances we cannot accept petitioner's testimony as being any evidence of the price at which his claims would have changed hands between a willing buyer and seller in an arms-length transaction. At *410 the time the mining claims were donated to BYU, Victor Sorbe told petitioner that in his opinion they had a value of $ 100,000. He subsequently gave petitioner an appraisal report dated August 26, 1987 which was submitted at trial as part of his testimony that the claims had a value of at least $ 100,000. Mr. Sorbe graduated in 1960 from the University of Utah with a Bachelor of Science degree in geology. Subsequently he completed some post-graduate studies towards a doctorate in geological engineering. From 1960 to 1963 and on a part-time basis thereafter, Mr. Sorbe worked for Lottridge and Thomas, a mining engineering firm which evaluates mining claims and oil leases for clients such as Chase Manhattan Bank, Exxon, Phillips, Standard Oil and Tenneco. Shortly before the trial, Mr. Sorbe had retired from the Utah Department of Transportation where he had worked full time as a materials engineer for about 25 years. Based upon his education, experience and personal knowledge of the area, it is apparent that Mr. Sorbe is generally qualified to testify as to the value of claims in the Gold Circle Mining District. We, however, are unable to attribute any weight to his valuation *411 in this case because neither his testimony nor his appraisal report contain any explanation as to how he arrived at a value of $ 100,000 for the claims in December of 1979. He merely states that given the location and the structural and economic geology of the claims such a value is conservative. No attempt is made to explain what is meant by "the structural and economic geology of the claims" although Mr. Sorbe does state that the subsequent increase in the mineral exploration of the area and in the number of claims located there as well as other activities by major mining companies indicate that his valuation was conservative. Since all such activity admittedly occurred subsequent to the date of the contribution we are unable to consider them in arriving at a value for the claims on the date of their donation to BYU. Additionally, Mr. Sorbe's valuation is unacceptable because it is inconsistent with his statement that he transferred his interest in part of the claims to petitioner prior to the donation because he was no longer interested in the claims. However, at the trial Mr. Sorbe still owned claims in the same area some of which are adjacent to the claims under consideration. *412 In fact, Mr. Sorbe's testimony contains a number of inconsistencies some of which are undoubtedly attributable to bias stemming from his ownership of other claims in the same area. In support of his valuation of the five claims donated to BYU petitioner also relies upon the testimony of Dr. Edward Bloomstein and an appraisal report prepared by Dr. Bloomstein and Steven A. Gallenson in December of 1983 from field work completed in September of 1983. In 1965 Dr. Bloomstein received the equivalent of a Ph.D. in geology from the National Geological Research Institute in Leningrad. From 1976 to 1982 he was employed by U.S. Steel as the supervisor of a group of geologists involved in gold exploration in the Midas area. He has also staked several claims in the area and has a good working knowledge of its geology and rock types. Dr. Bloomstein appraised the donated claims at $ 310,526. His appraisal is based in substantial part upon a lease purchase agreement covering nineteen unpatented mining claims known as the Esmeralda group which are located approximately two miles to the south of the donated claims in the Gold Circle Mining District. In April of 1974 Midas Mining and Development *413 Corporation (Midas), the owner of the Esmeralda Group, entered into the lease purchase agreement with Four Winds Enterprises (Four Winds). Under the terms of the agreement Four Winds was required to make lease payments to Midas equal to ten percent of the net mill or smelter returns less transportation costs received by Four Winds for ores sold from the fifty-nine claims in the Esmeralda Group during the ten year period commencing on May 1, 1974 and ending on April 30, 1984. The agreement contained a schedule of minimum advance lease payments which Four Winds was required to pay of $ 3,000 for May of 1974, $ 3,000 for June of 1974, $ 1,000 per month for July of 1974 through March of 1975, $ 50,000 per year for the next three years, and $ 55,000 per year for the remaining six years of the lease for a total of $ 495,000 in minimum advance lease payments. Under the agreement Four Winds was granted an option to purchase the claims at any time during the continuance of the lease upon the payment of $ 500,000 (the total of the minimum advance lease payments of $ 495,000 plus $ 5,000) and two percent of the net mill or smelter returns until a total of $ 2,000,000 had been paid to Midas. *414 Under its lease purchase agreement with Midas, Four Winds had still another option which was to cancel the agreement at any time and completely terminate Four Winds' liability under the agreement including liability for any unpaid minimum lease payments. In 1975, the option to terminate was exercised by Four Winds and the lease purchase agreement was cancelled after Four Winds had made only $ 4,000 in minimum lease payments. From his examination of the lease purchase agreement between Midas and Four Winds Dr. Bloomstein concluded that the total value of the fifty-nine Esmeralda claims was $ 2,000,000, the total payments required by Four Winds to exercise its option to purchase the Esmeralda claims. By assuming that the nineteen Esmeralda claims were equal in value he concluded that the value of one was $ 105,263 and the value of five was $ 525,315 which he then discounted to $ 310,526. He explained this discount by pointing to the fact that respondent's agent had used the lease purchase agreement between Midas and Four Winds as a comparison but used only the actual payments under the agreement of $ 4,000 for the total value of the five claims under consideration and used a discount *415 similar to Dr. Bloomstein's in order to arrive at a total value of $ 2,500 or $ 500 per claim. Although admitting that in the absence of drilling there could be no assurance that the Elko Prince vein extended onto petitioner's claims, Dr. Bloomstein also assumed that it did and estimated that it contained 10,500 ounces of recoverable gold with a value in the ground of $ 1,365,000. We are unable to attribute any weight to either of Dr. Bloomstein's conclusions because (1) he admits that the presence of the Elko Vein on petitioner's claims cannot be assured and (2) the record before us contains no reasonable basis for a finding that the lease purchase agreement between Midas and Four Winds indicates a value of $ 2,000,000 for the Esmeralda claims. Under the lease purchase agreement, this amount was not payable unless and until Four Winds not only established the existence of valuable ore reserves on the claims but actually extracted and sold at least a substantial portion of such ores. At trial and on brief respondent relied upon the testimony and an appraisal made by Dr. Charles Miller. Dr. Miller holds bachelors degrees in geology and mining engineering from Lehigh University. *416 He also has a master's degree and a Ph.D. in geology from Stanford University. From 1964 to 1985 Dr. Miller was employed by Amax Exploration as a senior geologist and regional manager. From 1985 through the date of trial he was a consulting geologist and had been involved in several prospect examinations, ore reserve estimations, and project evaluations. During the spring semesters of 1986 and 1987, Dr. Miller was an adjunct professor of geology at the University of Arizona. He is a registered geologist in Arizona and California and prior to this case he had valued mining claims in Nevada but not in the Midas area. During July and August of 1987, Dr. Miller spent nine days conducting field examinations on the subject claims as well as other claims in the area, six days researching the Elko County and Bureau of Land Management records, and two days compiling the information he had gathered into a report. The field examination of the five donated claims was made by Dr. Miller in order to determine the presence and value of any mineral resources on the claims in December of 1978 since the value of such resources usually constitutes the amount of money a prudent purchaser is willing *417 to pay in cash for claims. The field examination consisted of thoroughly traversing the claims, mapping their geology, sampling any mineralization, and noting any physical work which had been done on the claims. The samples collected were analyzed for Dr. Miller by a laboratory in Arizona. From the laboratory analysis and his field examination Dr. Miller concluded that in 1978 there had been no proven ore on the five claims and no evidence of drilling or other three dimensional sampling. He further concluded that there were no surface indications of any significant mineralization. His ultimate conclusion was that there was no proven mineral resources present on the claims in December of 1978. From his search of the public records Dr. Miller prepared a list of all lease purchase or option agreements entered into between 1968 and 1978 on mining claims located within one mile of petitioner's claims. From an examination of the claims on this list, which included the Esmeralda group as well as a group of claims known as the Gold Nugget group, Dr. Miller concluded that the Gold Nugget group was the most similar in size, location, and geological nature to the claims of petitioner. *418 Dr. Miller found that the Gold Nugget group, consisting of six claims adjacent to the claims at issue, had been involved in three separate agreements from 1968 to 1978. Upon determining that under the three agreements between 1968 and 1978 the average amount paid on the lease purchase or option agreement on each Gold Nugget claim was $ 1,844, Dr. Miller concluded that the value of each of petitioner's claims in 1978 was $ 1,844 for a total of $ 9,220. In final analysis Dr. Miller concluded and we agree that no value can be attributed to petitioner's claims in 1978 for mineral resources known to be present on the claims. Since as stated by Dr. Miller, and generally agreed to by Dr. Bloomstein, "the value of the mineral resources of a mining claim is directly determined by the quantity and quality of ore which occurs on the claim," when as in this case there is no "proven ore a mining claim has no present cash value for its mineral resources" and "any potential future value of a claim (based on its surface indications) does not add present cash value to the claim, except in the form of payments made to acquire or extend" lease purchase or option agreements. Consequently we are *419 in agreement with Dr. Miller's determination that the best evidence of the value of the claims in this case in 1978 is the amount of money that would have been paid at that time under a lease purchase or option agreement on the claims. In fact this method of valuing claims is approved by petitioner's own expert, Dr. Bloomstein, who testified that as a general rule mining companies will not consider an outright purchase of a claim which has no established reserves and that in the absence of such reserves a typical mining deal consists of a lease purchase or option agreement under which the lessee or optionee has the right to terminate the agreement at will or to extend it with future payments. Under such an agreement the mining company has an opportunity to explore the situation and if the exploration proves to be promising the agreement is extended by the mining company with further payments. If not promising the mining company terminates the agreement as done by Four Winds with respect to the Esmeralda claims, by the mining companies with respect to the Gold Nugget claims, and Exxon with respect to the claims under consideration after they were donated by petitioner to BYU. *420 In view of the foregoing and from the record as a whole we conclude that the proper method of determining a value for the donated claims is that adopted by Dr. Miller and that the total value of the claims on the date of their donation was $ 9,220 as determined by him. (3) Additions to Tax under Section 6621(c)
Finally, we turn to the issue of whether petitioners are liable for additional interest under section 6621(c) which provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (an underpayment in excess of $ 1,000) which is attributable to a tax motivated transaction. Section 6621(c) is applicable to a transaction such as petitioner's donation which is entered into prior to its enactment but the additional interest only accrues after December 31, 1984. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Transactions which are *421 to be considered as "tax motivated" are enumerated in section 6621(c)(3)(A). These transactions include "any valuation overstatement (within the meaning of section 6659(c))." Section 6621(c)(3)(A)(i). A valuation overstatement within the meaning of section 6659(c) occurs when "the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." Section 6659(c). On their joint returns for 1978, 1979, 1980 and 1981 petitioners reported the value of the five claims at $ 100,000. We have found that the value of such claims was $ 9,220. Consequently, a valuation overstatement within the meaning of section 6659(c) has occurred and the underpayment of tax which is attributable to the deduction of the overstated value is attributable to a tax motivated transaction and petitioners are liable in each of said years for additional interest under section 6621(c). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure.↩