WARREN R. HAUGHT AND LENNA G. HAUGHT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BARRY D. HAUGHT, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Haught v. Commissioner
Docket Nos. 28258-88, 28286-88
United States Tax Court
T.C. Memo 1993-58; 1993 Tax Ct. Memo LEXIS 61; 65 T.C.M. (CCH) 1921; February 22, 1993, Filed *61 Decision will be entered under Rule 155. For petitioners: Barry Lieberman For respondent: Ronald T. Jordan
WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: The cases of petitioners Warren R. and Lenna G. Haught, docket No. 28258-88, and petitioner Barry D. Haught, docket No. 28286-88, were consolidated for purposes of trial, briefing, and opinion. In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income tax for taxable year 1982 as follows: Additions to Tax
Docket No.
Deficiency
Sec. 6659
28258-88
$ 231,512.00
$ 69,454.00
28286-88
68,043.89
20,413.17
Respondent also determined that each petitioner's underpayment of Federal income tax was substantial and attributable to a tax-motivated transaction within the meaning of section 6621(c); [1] accordingly, respondent determined that the annual rate of interest payable on petitioners' underpayments was 120 percent of the adjusted rate established under section 6621(b). *62 The issues presented for decision for taxable year 1982 are: (1) The fair market value of the property petitioners transferred to the Smithville United Methodist Church on November 10, 1982, for purposes of the charitable contribution deduction. We hold that the fair market value of the donated property was $ 534,144. (2) Whether petitioners are liable for the addition to tax pursuant to section 6659 for valuation overstatements. We hold that they are. (3) Whether petitioners' underpayments of Federal income tax are subject to the increased rate of interest provided by section 6621(c). We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are incorporated in this opinion by reference. Petitioners Warren R. and Lenna G. Haught resided in Boulder City, Nevada, at the time they filed their petition. Petitioner Barry D. Haught resided in Tampa, Florida, at the time he filed his petition. Petitioners Warren R. Haught and Barry D. Haught
In 1982, petitioner Warren R. Haught resided in Smithville, West Virginia. Hereinafter, all references to petitioner in the singular refer to petitioner Warren R. Haught. The highest level of education completed *63 by petitioner was high school. Petitioner has spent the majority of his life drilling and producing oil and gas wells. Between 1978 and 1982, petitioner drilled approximately 200 wells per year. Between the years 1979 and 1980, petitioner held leasehold interests in approximately 250,000 acres in West Virginia. Between 1979 and 1982, petitioner and his son, petitioner Barry Haught, were partners in a partnership in which petitioner held a 75-percent interest and in which his son held a 25-percent interest. Lease Transfers
On June 18, 1979, petitioner entered a lease agreement in which he acquired the oil and gas rights to two parcels of real estate located in Ritchie County, West Virginia. The first parcel of real estate consisted of 163 acres and will hereinafter be referred to as the Lena Carr property. The second parcel of real estate consisted of 160 acres and will hereinafter be referred to as the Mark Taylor property. As lessee of the two parcels of property, petitioner acquired the right to drill wells and to produce and market all oil and gas derived therefrom. He also acquired all other drilling and surface rights on the two parcels of land. Upon acquiring *64 these leases, petitioner transferred them to the partnership in which he and his son were partners. The June 1979 lease contains the following pertinent provisions: SEVEN: The party of the second part [petitioner] shall have the said leases for and during the period of one (1) year from the date hereof, and as long thereafter, after commencement of operations on a tract, as said premises are operated for the production of oil and gas, or as oil and gas are found by the party of the second part in paying quantities thereon. Insofar as the extension of the term beyond one (1) year, each tract or lease will be considered individually; that is, a well commenced on one tract will hold drilling rights beyond one (1) year on that tract only. EIGHT: It is understood and agreed that each well drilled hereunder shall hold twenty (20) acres of a particular lease; and the failure to drill additional wells on any tract, before the expiration of one year, will result in the automatic reversion of the balance of that lease to the parties of the first part.
A West Virginia attorney allegedly advised petitioner that the lessor had to initiate legal proceedings in order for petitioner's *65 leasehold interests to revert to the lessor pursuant to these provisions. The lessor never initiated such proceedings. On August 12, 1980, the lessors extended the lease agreement an additional 6 months from the date of August 12, 1980. The Lena Carr and Mark Taylor Wells
As a well operator, petitioner's general practice was to drill a well to its total projected depth and to complete the well at this depth for the production of oil and gas. Petitioner would not initially complete all potentially productive zones within the well because he considered it more profitable to wait to do so at a time when oil and gas prices had escalated. He also preferred to drill wells in this manner in order to acquire information regarding other potentially productive upper zones within a well. Petitioner utilized electric logs to determine which zones of a well contained potential oil and gas reserves. Among other things, electric logs survey the temperature within a well thereby indicating which, if any, zones within a well are emitting gas; the presence of gas indicates the potential existence of oil and gas reserves. In December 1979, petitioner drilled a well on the Lena Carr property *66 to a depth of 5,990 feet. As was his general practice, petitioner did not initially develop the upper zones within the well; however, he did intend to complete them at a later date. Petitioner had an electric log prepared on the Lena Carr well. The partnership reported the Lena Carr well as being placed in service on January 1, 1980, with a cost basis of $ 113,431, which includes $ 28,266 for the purchase of well equipment and machinery and $ 85,165 for intangible costs. In August 1980, petitioner drilled a well on the Mark Taylor property to a depth of 2,300 feet. Petitioner did not drill this well as deep as the Lena Carr well because his purpose in drilling the Mark Taylor well was simply to retain his lease rights; i.e., petitioner's leasehold interest would have reverted to the lessors had he not drilled a well thereon prior to a specified date. Petitioner intended to return and drill deeper into the Mark Taylor well at a later date; however, he ran out of time and money to do so. Petitioner also had an electric log prepared on the Mark Taylor well. The partnership reported the Mark Taylor well as being placed in service on August 15, 1980, with a cost basis of $ 58,036, *67 which includes $ 12,049 for the purchase of well equipment and machinery and $ 45,987 for intangible costs. On August 11, 1980, the lessors granted the Mark Taylor well to petitioners Warren and Barry Haught. Both the Lena Carr and Mark Taylor well produced oil and gas upon inception; however, both primarily produced gas. During the years 1980 through 1982, CNG Transmission Corp. (CNG) purchased gas from the partnership that was derived from the Lena Carr well, the Mark Taylor well, and another well. CNG's records on the gas production history of the Lena Carr and Mark Taylor wells indicate entries for "B-O Taxes" in the amounts of $ 1,359.53 and $ 1,877.36 for 1981 and 1982, respectively. Other Well Locations on Properties
Prior to or contemporaneous with drilling the Lena Carr and Mark Taylor wells, petitioner hired a surveyor to stake six other potential well locations on the leased properties. Petitioner thereafter obtained permits to drill wells on these six locations. Such permits expired 1 year after issuance. Petitioner did not drill a well on any of these six locations nor did he renew the drilling permits for them. Subsequent Assignments of Leasehold *68 Interests
On December 16, 1981, unbeknownst to petitioner, the original grantors of the Lena Carr and Mark Taylor leases assigned the leasehold interests to White's Well Service, Inc. The lessors specifically excluded the Lena Carr and Mark Taylor wells and 200 feet surrounding each well from this 1981 assignment. This December 1981 lease agreement provided that the lessee was required to drill a well prior to July 15, 1982, on each of the leasehold interests acquired. The lessee was also required to drill a subsequent well on each location every 6 months thereafter. Failure to comply with these provisions would result in the assignment being voided and any undrilled property reverting to the lessor. To petitioner's knowledge, White's Well Service never staked or drilled any wells on other parts of the Lena Carr and Mark Taylor properties. 1982 Charitable Contribution to Church
In 1982, petitioner was a trustee of the Smithville United Methodist Church (Smithville Church or the church) located in Smithville, West Virginia. Petitioner also taught Sunday school classes at the church. On November 10, 1982, desiring to provide the church with a steady source of future *69 income, petitioner and his son assigned their interests in the Lena Carr and Mark Taylor leases to the church. Petitioner believes that he donated both the wells and leases to the church. Subsequent to their transfer, petitioner continued to operate the wells for the church at a nominal fee. Other than this right to operate, petitioner retained no interest in the Mark Taylor well, the Lena Carr well, or the remaining leasehold interests. Petitioner chose these interests to transfer to the church because he believed the Mark Taylor and Lena Carr wells contained sufficient reserves to provide the church with a flow of future income. Wells in Ritchie County, West Virginia, historically produce oil and gas for many years, sometimes 60 to 80 years. In the years 1983 through 1986, the wells produced gas, and the church received net royalty payments from petitioner in the respective amounts of $ 10,726.03, $ 8,168.80, $ 1,952.71, and $ 1,033.33. 1982 Miscellaneous Events
In 1982, petitioner sold his fractional working interests in 25 wells located in the West Virginia area for $ 3,634,707. Petitioner had a 12.5- to 37.5-percent interest in each of these wells. The wells were *70 located in the same geological foundation as the Lena Carr and Mark Taylor wells and contained potential oil and gas reserves in uncompleted intervals within the wells. Petitioner believes the wells were comparable to the Lena Carr well. In 1982, gas prices had increased from prior years and were expected to continue increasing. While oil prices were decreasing, they were still higher than they had been in prior years. Historically, it was difficult to obtain leases for oil and gas rights in Ritchie County, West Virginia, and it was more difficult to obtain such in 1982 due to the surge in gas prices. Petitioners' 1982 Federal Income Tax Returns
Petitioner and his wife and petitioner Barry Haught claimed a charitable contribution deduction on their timely filed 1982 Federal income tax returns for the property donated to the Smithville Church. Prior to filing their 1982 Federal income tax returns, petitioners retained the firm of Oilfield Specialists, Inc. (OSI), to provide a report on estimated recoverable oil and gas reserves and potential revenues contained within the Lena Carr and Mark Taylor wells. In a report dated April 11, 1983, OSI determined that the Lena Carr *71 well had potential gas reserves valued at $ 1,148,063 and potential oil reserves valued at $ 896,610.40. OSI also determined that the Mark Taylor well had potential gas reserves valued at $ 660,261 and no potential oil reserves. The parties have agreed that OSI's report is introduced into evidence solely for background information and is not to be considered as substantive evidence of the value of the property donated by petitioners to the Smithville Church in 1982. Petitioners' accountant utilized OSI's report to calculate the value of the donated property for tax purposes. The accountants first spread the revenue figures supplied by OSI over a 15-year period, with the largest share of income projected into the early years. The accountants then subtracted royalties due and estimated operating costs to reach estimated net revenue figures. Utilizing a discount rate of 12 percent, the accountants then discounted the estimated net revenue figures to a present fair market value of $ 961,227 for the Lena Carr well and $ 304,750 for the Mark Taylor well; thus, to a cumulative present fair market value of $ 1,265,977 for the donated property. To arrive at the amount of each petitioner's *72 charitable contribution deduction, the accountants reduced these figures by original intangible drilling costs, section 1245 depreciation recapture, and capital gains amounts. The accountants determined that petitioner and his wife's charitable deduction was $ 500,565 and petitioner Barry Haught's charitable deduction was $ 166,855. By separate statutory notices of deficiency issued to petitioners Warren R. and Lenna G. Haught, and petitioner Barry D. Haught, respondent determined that the fair market value of the property donated to the Smithville Church was $ 138,000. Church's 1986 Sale
In 1986, the trustees of the Smithville Church decided to sell the church's interest in the Lena Carr and Mark Taylor properties. The trustees decided to sell the properties due to low production, due to insufficient capital to recomplete other potentially productive zones within the two wells, and due to arising concerns regarding the effect of the church's owning such leasehold interests upon its tax-exempt status. The church could have obtained financing to develop the wells further; however, it was not a practice of the church to borrow money. Petitioner, still a trustee of church, *73 felt that it would be more productive for the church to develop the uncompleted zones within the wells rather than to sell the leases. However, on May 14, 1986, the church sold its working interests in the leases to Mid Oil, Inc., for $ 50,000. Mr. Ronald Cook, the sole shareholder of Mid Oil, Inc., determined that $ 50,000 was a good price for the two wells because similar wells located in the same vicinity were then currently selling for as much as $ 250,000 each. Mr. Cook believed he was purchasing the working interests in the two wells and the 323 acres of land on which the wells were situated. After Mid Oil, Inc., purchased the wells, Mr. Cook completed an additional zone in the Lena Carr well at the 3,900- to 4,300-foot level which produced over 70 million cubic feet of gas and yielded over $ 250,000 in revenues. He testified that the pressure in the Lena Carr well had just begun to come down which would increase the potential of oil production. Mr. Cook met petitioner for the first time in 1983, and then again in 1984 and 1986. Petitioners and Mr. Cook were not related. OPINION Issue 1. Fair Market Value of Donated Property
The first issue we must decide is *74 the fair market value of the property petitioners transferred to the Smithville Church on November 10, 1982, for purposes of the charitable contribution deduction. The fair market value of donated property other than money is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs. The fair market value of property that is the subject of a charitable contribution is an issue of fact to be resolved from consideration of all the relevant evidence of record in the case. Skripak v. Commissioner, 84 T.C. 285, 320 (1985); Zmuda v. Commissioner, 79 T.C. 714, 726 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Further, while we must consider the entire record, we have broad discretion to decide what facts are most important in reaching our conclusion because "finding market value is, after all, something for judgment, experience, and reason". Colonial Fabrics, Inc. v. Commissioner, 202 F.2d 105, 107 (2d Cir. 1953), *75 affg. a Memorandum Opinion of this Court dated Jan. 22, 1951. Given the complicated nature of this valuation case, we note that valuation issues are inherently imprecise and capable of resolution only by Solomon-like pronouncement. Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987). Petitioners contend that the fair market value of the donated property as of the donation date of November 10, 1982, is $ 1,015,393 while respondent contends that the fair market value is $ 85,810. As is customary in valuation cases, petitioners and respondent rely heavily on expert opinion to support their respective positions regarding the fair market value of the donated property. We evaluate expert opinions in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner, 480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970); Parker v. Commissioner, 86 T.C. 547, 561 (1986). As the trier of fact, we are not bound by an expert's opinion where it is contrary to our judgment. Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); *76 Estate of Kreis v. Commissioner, 227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139; IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991), on appeal (8th Cir., Oct. 2, 1992). Further, we may accept the opinion of an expert in its entirety, Buffalo Tool and Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980), or we may be selective in the use of any portion of such an opinion, Parker v. Commissioner, supra at 562. Consequently, we will consider expert opinion to the extent that it assists us in resolving the issues presented by the instant case. IT&S of Iowa, Inc. v. Commissioner, supra at 508. Petitioners have submitted Mr. Kenneth Weikel [2] as an expert witness, and respondent has submitted Mr. John Blomberg as an expert witness. [3] As is typical in valuation cases, the experts differ regarding the fair market value of the donated property. We have reviewed the qualifications of both experts and accept both as qualified experts in the area of valuing oil and gas *77 properties in Ritchie County, West Virginia. We have not, however, accepted either expert's opinion in its entirety. Rather, we have arrived at a somewhat Solomon-like resolution of this complicated, inherently imprecise issue by being selective in the use of portions of their opinions. *78 Both Mr. Weikel and Mr. Blomberg are petroleum engineers. A petroleum engineer usually prepares an appraisal of oil and gas property in the following manner: (1) An estimate is made of the recoverable oil in barrels or of gas in cubic feet belonging to the interest which is to be valued; (2) the estimated recoverable reserves are multiplied by the current price of oil or gas to determine the expected future gross income; (3) an estimate is made of the expected life of the property; (4) an estimate is made of the expense to be incurred in the operation of the property over its life; (5) the estimated expense is deducted from the estimated gross income to produce the expected future net operating income over the life of the property; (6) the salvage value which will be realized from the equipment on abandonment of the property is determined and added to the future net operating income to arrive at the total expected future net income; and (7) the total expected future net income is discounted to arrive at the present value of the future net income to a prospective purchaser, taking into account the risks involved in oil and gas properties. See Stanton v. Commissioner, T.C. Memo. 1967-39; *79 see also Fiske, Federal Taxation of Oil and Gas Transactions 166 (1965). Both Mr. Weikel and Mr. Blomberg prepared their expert reports pursuant to this standard appraisal method. Both experts have attributed a value to reserves hereinafter referred to as proved developed producing reserves. Only petitioners' expert, Mr. Weikel, however, has attributed a value to reserves hereinafter referred to as behind-the-pipe reserves and proved undeveloped reserves. Proved Developed Producing Reserves
Proved developed producing reserves refer to potential reserves located in completed, producing zones within the Lena Carr and Mark Taylor wells. Again, both Mr. Weikel and Mr. Blomberg agree that in arriving at the value of the donated property for fair market value purposes, a value should be attributed to such reserves. The methodologies and calculations utilized by the experts in arriving at their respective fair market valuations are similar in many respects. [4] Nevertheless, petitioners' expert determined that the fair market value of such reserves was $ 130,624 while respondent's expert determined the fair market value of such was $ 85,810. Neither party has fully explained *80 the reasons for the difference in their experts' valuations. After carefully reviewing the record in this case, we conclude that the difference in the experts' valuation figures is attributable to two significant factors. First, Mr. Weikel estimates net recoverable gas reserves in an amount exceeding Mr. Blomberg's estimation by 22.809 million cubic feet. [5] Both experts utilized decline curves based upon the production history of the wells to arrive at their estimation of the cubic feet of gas contained within the wells. Unlike Mr. Weikel, Mr. Blomberg did not review separate production data *81 on each well, nor did he review the individual decline curves on the wells. Mr. Blomberg did not think such would change his final results, however. The record contains no further evidence upon which we can properly evaluate this issue. Given that petitioners have the burden of proving their entitlement to any deductions claimed, Indopco, Inc. v. Commissioner, 503 U.S.    ,    112 S. Ct. 1039, 1043 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934), we find that the wells contained recoverable gas reserves in the amount estimated by respondent's expert.
*82 The second significant difference in the experts' valuations is that respondent's expert deducted an expense from estimated gross income that petitioners' expert did not; i.e., respondent deducted an expense for business and occupational taxes imposed by the State of West Virginia. Mr. Weikel did not include such a deduction in his calculations because gas companies in Ritchie County, West Virginia, reimbursed petitioner, an independent well operator, for such expenses. Mr. Blomberg had no knowledge of this standard practice but acknowledged that if such were a standard practice, it would effect an increase in the amount he estimated for expected future revenues to be derived from proved developed producing reserves. Respondent has presented no evidence actually contradicting petitioners on this point. The record indicates entries in CNG's gas production history on the Lena Carr and Mark Taylor wells which support the actual existence of such a reimbursement; i.e., the two entries for "B-O Taxes" in the amounts of $ 1,359.53 and $ 1,877.36 for 1981 and 1982. We conclude that West Virginia oil and gas taxes should not be considered in arriving at the expected future income to *83 be derived from proved developed producing reserves. In sum, we find that the fair market value of the proved developed producing reserves contained within the Lena Carr and Mark Taylor wells as of November 10, 1982, is the amount determined by respondent's expert increased by the amounts deducted for business and occupational taxes. We find that the fair market value of such reserves is $ 94,575. See attached appendix for the calculation of this fair market value. Behind-the-Pipe Reserves
Behind-the-pipe reserves refers to potential reserves located within the uncompleted, nonproducing zones of the Lena Carr well. Petitioners' expert, Mr. Weikel, has determined that the Lena Carr well contained behind-the-pipe reserves with a fair market value of $ 439,569 as of the donation date. Mr. Blomberg did not attribute a value to these reserves for fair market value purposes. Mr. Blomberg attributed no value to such reserves because, given the uncertainty in the existence of such reserves, he could find no evidence justifying that the completion of such would yield economic results. He testified, however, that it would depend upon the individual buyer whether to attribute *84 a value to behind-the-pipe reserves for fair market value purposes. Further, he could not say that another buyer of oil and gas leases would not pay for the potential of recovering any potential reserves located in the uncompleted zones within the Lena Carr well. In 1982, Mr. Blomberg had no personal knowledge regarding the sales of comparable oil and gas wells in Ritchie County, West Virginia. Mr. Weikel, who participated in the sale of oil and gas properties in Ritchie County in 1982, testified that it was his personal experience that owners of oil and gas wells in Ritchie County refused to sell their wells in 1982 unless they received consideration for behind-the-pipe reserves. Further, oil and gas leases were more difficult than usual to obtain in Ritchie County in 1982 due to the escalation in gas prices. Finally, petitioner testified that he sold his interests in 25 other wells in West Virginia in 1982 that contained behind-the-pipe reserves. In sum, the uncontroverted evidence presented by petitioners indicates that buyers and sellers of oil and gas wells in Ritchie County in 1982 were attributing a value to behind-the-pipe reserves. Therefore, we cannot agree with respondent *85 that the value of such reserves should not be considered in determining the fair market value of the donated property at issue. The next issue we face is determining the fair market value of the behind-the-pipe reserves located in the Lena Carr well as of November 10, 1982. Mr. Blomberg did not include an appraisal of such reserves in his report. Mr. Weikel again followed the standard appraisal procedure employed by petroleum engineers to appraise the value of behind-the-pipe reserves. Mr. Weikel utilized the "analogy method" to estimate the recoverable amount of oil and gas located in uncompleted intervals within the well. The analogy method involves compiling decline curves of hundreds of wells drilled in the Ritchie County area that are producing or have produced in each of the four zone formations found in the Lena Carr well. [6] An average decline curve is then developed for each of the four zones. This average decline curve indicates an average recoverable amount of oil and gas that can be expected to be found in each of the four zone formations. *86 Mr. Weikel has personally utilized the analogy method to appraise other wells drilled in Ritchie County, West Virginia, and believes that it is the best method available in many cases. Further, he testified that a number of major engineering firms have determined that the analogy method is the only tool available in West Virginia to value behind-the-pipe reserves. Mr. Blomberg acknowledges that the analogy method is an acceptable method for determining the amount of potentially recoverable oil and gas reserves. Mr. Blomberg believes, however, that this method is the least reliable method to determine the recoverable amount of behind-the-pipe reserves in the Lena Carr well. Mr. Blomberg criticizes the analogy method because he believes it fails to consider the wide variance of geographical formations in Ritchie County's subsurface. We find his criticism unfounded, however, because to account for such geographical differences, Mr. Weikel utilized decline curves of hundreds of wells located in each of the four zones to compile his average decline curves. For example, he used a sample of 600 to 700 wells drilled in the Big Injun zone to arrive at potential reserves contained therein. *87 Moreover, Mr. Weikel did not exclusively rely upon the analogy method in determining that the Lena Carr well contained behind-the-pipe reserves. He also relied upon electric logs to determine that potential reserves existed in uncompleted zones within the Lena Carr well. Mr. Blomberg acknowledges that the electric log on the Lena Carr well indicates gas saturation in the Weir zone and a gas temperature kick in the Devonian Shale zone. [7] Mr. Blomberg also acknowledges that a gas temperature kick indicates that it is more likely than not that gas reserves will be recovered at that point. Mr. Blomberg further acknowledges that each of the four zones in the Lena Carr well is potentially productive and that wells within a 5-mile radius of the Lena Carr well were producing in each of these four zones. Most importantly, Mr. Blomberg acknowledges that potential reserves existed within uncompleted intervals of the Lena Carr well as of November 10, 1982. *88 In sum, the uncontroverted evidence indicates that the Lena Carr well contained behind-the-pipe reserves as of November 10, 1982. We find that the Lena Carr well contained net behind-the-pipe gas reserves as estimated by Mr. Weikel as of November 10, 1982, in the amount of 208.944 million cubic feet. Regarding net behind-the-pipe oil reserves, Mr. Weikel estimated a recoverable amount of 9,296 barrels. Mr. Blomberg basically believes that such an estimation is too high given that the Lena Carr well produced no oil upon inception. While the record does not indicate the exact amount of oil the Lena Carr well produced upon inception, it does indicate that the well produced oil at this time. Mr. Blomberg was not aware of this fact. Given that respondent has presented no further evidence contradicting Mr. Weikel's estimation of behind-the-pipe oil reserves, we find that the Lena Carr well contained behind-the-pipe oil reserves in the amount of 9,296 barrels as of the donation date. Using a 12-percent present value discount figure, Mr. Weikel estimates that $ 627,956 is the expected future net operating income to be derived from behind-the-pipe oil and gas reserves in the Lena Carr *89 well. To arrive at the fair market value of these reserves, Mr. Weikel reduced this present value figure at trial by 30 percent to account for the amount of risk inherent in an investment in oil and gas properties. [8] Mr. Weikel believes the risk factor could be as high as 55 percent; however, in his opinion a 30-percent risk factor was appropriate. He chose 30 percent because such is an average of two comparable risk factors that people he worked for either paid or received in comparable sales at this time; i.e., 10 percent and 55 percent. *90 Mr. Blomberg was not familiar with either of these two sales. Furthermore, he did not participate in any sales of oil and gas leases in Ritchie County in 1982 and did not review any sales of comparable wells in this timeframe to prepare his appraisal report. Respondent has introduced no evidence contradicting 30 percent as a reasonable risk factor percentage. We find 30 percent to be a reasonable risk factor. See also Hightower v. Commissioner, T.C. Memo. 1972-252 (Court applied a 25- to 30-percent risk factor); Stanton v. Commissioner, T.C. Memo. 1967-39 (Court applied a 40-percent risk factor). Respondent has presented no further evidence contradicting the fair market calculation arrived at by petitioners for behind-the-pipe reserves. Accordingly, we find that the fair market value of behind-the-pipe reserves in the Lena Carr well as of November 10, 1982, is $ 439,569. In arriving at this figure, we found petitioner's 1982 sale of 25 other allegedly comparable wells irrelevant, given the sparsity of facts contained within the record regarding these other wells. Proved Undeveloped Reserves
Proved undeveloped *91 reserves refer to those potential reserves located in the 283 undrilled acres on the Lena Carr and Mark Taylor properties. Petitioners' expert determined that seven additional wells could be drilled on this acreage and determined that each additional well would have a fair market value of $ 63,600 as of November 10, 1982. Respondent contends that because petitioner did not drill a well on any of this remaining acreage, his interest in the 283 acres reverted to the original lessor pursuant to the original lease agreement prior to the donation date. It is well settled that in the application of a Federal revenue act, State law controls in determining the ownership of property or rights thereto. United States v. Mitchell, 403 U.S. 190 (1971); Morgan v. Commissioner, 309 U.S. 78 (1940). The original lease agreement [9] transferring petitioner's leasehold interests to him was executed in West Virginia; accordingly, the law in this State is applicable to the instant issue. The 1979 lease agreement contains a habendum clause, which is a traditional conveyancing provision found in most oil and gas leases. A habendum clause *92 is a provision that defines and limits the duration of a lessee's estate. McCullough Oil, Inc. v. Rezek, 346 S.E.2d 788, 793 (W.Va. 1986). A habendum clause usually provides for a primary term which consists of a fixed period of time and a secondary term which extends the primary term for e.g., as long as oil and gas is produced in paying quantities on the leased property. Id.
Pursuant to the law of West Virginia, a habendum clause does not convey an interest subject to a condition subsequent, i.e., an interest which the lessor has the optionally exercisable power of declaring a forfeiture upon nonproduction or cessation of production. Id. at 794. Rather, a habendum clause providing for a short primary *93 term and a secondary term conveys a determinable interest, i.e., an interest subject to a special limitation. Id. This determinable interest automatically terminates by its own terms upon the expiration of the primary term or upon the cessation of production or operations during the secondary term. Id.
The primary period contained within the habendum clause in the instant case provides that petitioner's leasehold interests in the Lena Carr and Mark Taylor properties commenced June 18, 1979, and existed for a 1-year period thereafter. The original lessor thereafter extended this primary period to February 12, 1981. The secondary period extends petitioner's leasehold interest in a 20-acre tract containing a well for as long as the premises are operated for the production of oil and gas or for as long as oil and gas are found by petitioner in paying quantities thereon. Petitioner drilled a well on the Lena Carr property in December 1979 and a well on the Mark Taylor property in August 1980. Thus, petitioner was in compliance with the habendum clause (including its extension) of the lease in respect to the 20-acre tracts on which these two wells were located. Petitioner's *94 interest in these two wells, and the two 20-acre tracts on which the wells were situated, continued for as long as the wells produced oil and gas or oil and gas were found by petitioner in paying quantities. On August 11, 1980, the original lessors transferred the Mark Taylor well to petitioners Warren and Barry Haught. As of November 10, 1982, both wells were producing oil and gas; thus, petitioner still retained his leasehold interest in the Lena Carr and Mark Taylor wells and the 20 acres upon which each was situated as of the donation date. Regarding the remaining 283 acres of the Lena Carr and Mark Taylor properties, however, petitioner did not drill a well on any of this acreage within the period provided by the lease's habendum clause or its extension. Accordingly, pursuant to the lease and the law of the State of West Virginia, petitioner's interest in this remaining acreage automatically reverted to the original lessors after the expiration of the extended primary period; i.e., February 12, 1981. On December 16, 1981, the original lessors leased the remaining acreage to a third party, White's Well Service, Inc. As of November 10, 1982, petitioner had no interest in *95 this remaining 283 acres that he or petitioner Barry Haught could transfer to the Smithville Church. Accordingly, the only property petitioners transferred to the Smithville Church on November 10, 1982, was the Lena Carr and Mark Taylor wells and the two 20-acre tracts upon which these wells were situated. Petitioners still contend that the fair market value of the donated property should include an amount for two potential well locations that can be drilled on these two 20-acre tracts. For the following reasons, we disagree. First, Mr. Weikel assigned reserves to these two locations in an amount equal to one-half of the reserves assigned to one zone within the Lena Carr well. This method appears arbitrary to this Court, and its reasonableness has not been explained by Mr. Weikel or by petitioners otherwise. Second, while Mr. Weikel testified that wells could be drilled productively within 20-acre spacing, Mr. Blomberg testified that they could not. For this reason, we are not convinced that additional wells could be drilled productively on the same 20-acre tracts upon which the Lena Carr and Mark Taylor wells were situated. Further, Mr. Weikel did not deduct any estimated *96 drilling costs from his projected income figures; therefore, such should logically reduce his income projection figures. Finally, given that petitioner expended $ 113,431 and $ 58,036, respectively, to drill the Lena Carr and Mark Taylor wells, the Court is not convinced that a willing buyer would attribute a value of $ 63,600 to reserves from which he conceivably may not recover his investment. Conclusion
We find that the cumulative fair market value of the donated property at issue as of November 10, 1982, is $ 534,144. Issue 2. Section 6659 Addition to Tax
Respondent determined that petitioners' 1982 underpayments of income tax were attributable to a "valuation overstatement" under section 6659 and, therefore, that petitioners are liable for an addition to tax in an amount up to 30 percent of their respective underpayments. Sec. 6659(b). A valuation overstatement occurs where the value of any property or adjusted basis of property claimed on any return is 150 percent or more of the value or adjusted basis that is determined to be the correct amount. Sec. 6659(c)(1). Notwithstanding the above, section 6659(e) provides that the Secretary may waive all or part *97 of the section 6659 addition to tax where the taxpayer shows "that there was a reasonable basis for the valuation or adjusted basis claimed on the return and that such claim was made in good faith". The decision of whether to grant or deny the waiver is discretionary and is reviewable only for an abuse of discretion, such as where the denial of waiver is arbitrary, capricious, or unreasonable. Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Hospital Corp. of America v. Commissioner, 81 T.C. 520, 594 (1983); see, e.g., Avers v. Commissioner, T.C. Memo. 1988-176. In application to the instant case, the value claimed by petitioners of the donated property on their 1982 Federal income tax returns ($ 1,265,977) is 150 percent or more of the correct value of the donated property ($ 534,144). Accordingly, each petitioner's underpayment is attributable to a valuation overstatement within the meaning of section 6659(c)(1). Petitioners argue, nevertheless, that they are not liable for the section 6659 addition to tax because respondent abused his discretion by refusing to waive these additions *98 pursuant to section 6659(e). Petitioners contend that they relied upon OSI's report and their accountants in arriving at the claimed valuation and, therefore, respondent should have waived the section 6659 addition to tax. The record does not indicate, however, that petitioners ever requested a waiver from respondent pursuant to section 6659(e). The record also fails to indicate that petitioners submitted enough information to respondent during the audit to support an inference that respondent considered a waiver knowing the facts as we have found them. See, e.g., Mailman v. Commissioner, 91 T.C. 1079, 1084 (1988); Magnus v. Commissioner, T.C. Memo. 1990-596. We are reluctant to find that respondent abused his discretion here when, for all the record establishes, he was not requested to exercise it. See Lapin v. Commissioner, T.C. Memo. 1990-343. Therefore, we sustain respondent's determination that petitioners are liable for the section 6659 addition to tax in the years at issue. Issue 3. Section 6621 Additional Interest
Section 6621(c), formerly section 6621(d), provides *99 for an increase in the interest rate where there is a "substantial underpayment" in any taxable year attributable to a "tax motivated transaction". The increased rate of interest is effective as to interest accruing after December 3, 1984 (the date of enactment of the original section 6621(d)), even though the tax-motivated transaction was entered into prior to that date and "regardless of the date the return was filed." Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986); H. Conf. Rept. 98-861 (1984), 1984-3 C.B.(Vol. 2) 1, 239. A "tax motivated transaction" includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). As discussed supra, each petitioner's underpayment of Federal income tax is attributable to a valuation overstatement within the meaning of section 6659(c)(1). Accordingly, we sustain respondent's determination that the interest payable on petitioner's underpayments of income tax is to be calculated pursuant to section 6621(c) as provided by H. Rept. 98-861, supra, and Solowiejczyk v. Commissioner, supra. *100 To reflect the foregoing, Decisions will be entered under Rule 155. APPENDIX CALCULATION OF FAIR MARKET VALUE OF PROVED DEVELOPED PRODUCING RESERVES Net
Recalculated
Discount
Income Per
B&O
Income Before
per
Net
Year
Blomberg
Taxes
Discount Figure
Blomberg
Income
1983
$ 15,519
$ 1,268
$ 16,787
.9449
$ 15,862
1984
14,020
1,187
15,207
.8437
12,830
1985
13,066
1,143
14,209
.7533
10,704
1986
12,588
1,133
13,721
.6725
9,227
1987
12,060
1,121
13,181
.6005
7,915
1988
11,556
1,113
12,669
.5361
6,792
1989
10,847
1,093
11,940
.4787
5,716
1990
10,432
1,095
11,527
.4274
4,927
1991
9,909
1,092
11,001
.3816
4,198
1992
9,637
1,109
10,746
.3407
3,661
1993
8,796
1,090
9,886
.3042
3,007
1994
8,220
1,092
9,312
.2716
2,529
1995
7,311
1,075
8,386
.2425
2,034
1996
6,128
1,009
7,137
.2165
1,545
1997
5,136
942
6,078
.1933
1,175
1998
4,147
876
5,023
.1726
867
1999
3,256
817
4,073
.1541
628
2000
2,368
758
3,126
.1375
430
2001
1,577
705
2,282
.1228
280
2002
883
659
1,542
.1096
169
2003
191
613
804
.0979
79
Cumulated Fair Market Value of Proved
Developed Producing
Reserves
$ 94,575
*101 Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Mr. Weikel's expert witness report indicates that the donated property was valued as of the effective date of Dec. 31, 1982, rather than Nov. 10, 1982, the date of the donation. Respondent has made no objections to Mr. Weikel's report on this basis.↩
3. Respondent also offered the expert testimony of Mr. Robert Dennis, a general engineer employed by the IRS, to establish a fair market value of the donated property. However, we attributed no value to his report or testimony due to the following reasons: (1) The record does not indicate that Mr. Dennis had any experience appraising oil and gas wells in Ritchie Co., W. Va.; (2) the report submitted as his expert report was never intended by Mr. Dennis to be final; (3) Mr. Dennis in part relied on hearsay information not normally relied on by appraisers of oil and gas wells in preparing his report; (4) Mr. Dennis' report was heavily based on information relating to market conditions in the year 1990; (5) Mr. Dennis examined no electric logs or production data on the wells at issue; and (7) Mr. Dennis had no personal experience regarding the sales price of oil and gas wells in 1982.↩
4. In estimating the amount of recoverable oil and gas in such reserves, both experts utilized the standard appraisal method employed by petroleum engineers, estimated similar amounts of potential recoverable net oil reserves, utilized the same present value discount figure, utilized similar oil and gas prices, and did not include within his valuation an expected salvage value of equipment upon the abandonment of the property.↩
5. The majority of the calculations contained within Mr. Weikel's report pertain solely to petitioner Barry Haught's interest in the donated property. Respondent has made no objections to Mr. Weikel's report on this basis. We extrapolated the figures and valuations pertaining to the entire interest in the donated property from the calculations pertaining to petitioner Barry Haught.↩
6. The four zone formations located in the subsurface of the Lena Carr well are the Big Injun located at approximately 0 to 2,000 feet below the subsurface, the Weir at approximately 2,000 to 2,500 feet below the subsurface, the Gordon at approximately 2,500 to 3,100 feet below the subsurface, and the Devonian Shale at approximately 3,100 to 6,000 feet below the subsurface.↩
7. Mr. Blomberg did not have the electric log on the remaining behind the pipe zone in the Lena Carr well, i.e., the Big Injun zone, at the time he prepared his appraisal report.↩
8. At trial, respondent objected to the admissibility of this direct testimony on the basis that it does not comply with the requirements of Rule 143(f). Rule 143(f)↩ provides that this Court can allow direct testimony from an expert witness at its discretion. At trial, we found good cause for Mr. Weikel's failure to apply a risk factor within his expert report and overruled respondent's objection to the admissibility of this testimony. So as not to prejudice respondent, however, we held the record open after trial for an ample amount of time allowing respondent to introduce additional evidence contradicting Mr. Weikel's report; respondent introduced no further evidence after trial.
9. Petitioners object to the admissibility into evidence of the original lease agreement on the grounds of lack of relevancy and materiality. Since such agreement was pertinent to our determination on this instant issue, we overrule this objection.↩